731 F.2d 1294
 76 A.L.R.Fed. 435, 17 Ed. Law Rep. 86
 Craton LIDDELL, et al., Plaintiffs/Appellees,
v.
STATE OF MISSOURI, et al., Defendants/Appellants.
Craton LIDDELL, et al., Plaintiffs/Appellees,
v.
CITY OF ST. LOUIS, Plaintiff-Intervenor/Appellant.
In re CITY OF ST. LOUIS, Paul Berra and Ronald A. Leggett,
Petitioners.
 Nos. 83-1957, 83-2033, 83-2118, 83-2140, 83-2220, and 83-2554.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 28, 1983.
Decided Feb. 8, 1984.
Order March 5, 1984.
 
 1
 Larry Marshall, Asst. Atty. Gen., Columbia, Mo., and Robert Dierker, Jr., Asst. City Counselor, City of St. Louis, St. Louis, Mo., for defendants/appellants.
 
 
 2
 Kenneth C. Brastron, William P. Russell, St. Louis, Mo., William L. Taylor, Center for National Policy Rev., Catholic University Law School, Washington, D.C., and John Gianoulakis, St. Louis, Mo., for plaintiffs/appellees.
 
 
 3
 Lay, Chief Judge, Heaney, Bright, Ross, McMillian, Arnold and Fagg, Circuit Judges, with John R. Gibson, Circuit Judge, concurring in part and dissenting in part, Bowman, Circuit Judge, dissenting.
 
 OPINION OF THE COURT EN BANC
 
 4
 The Caldwell and Liddell plaintiffs, representing black students and parents of the St. Louis City School District, the City School District, and several suburban school districts have entered into a unique and comprehensive settlement agreement designed to further desegregation in the city schools. The United States District Court has approved the agreement and has entered orders to fund the plan.
 
 
 5
 With the exceptions and limitations noted in the opinion, we approve the agreement and the order entered by the district court with respect to:
 
 
 6
 The voluntary transfers of students between the city and suburban schools and the establishment of additional magnet schools and integrative programs in the City School District as necessary to the successful desegregation of the city schools;
 
 
 7
 The quality education programs for the nonintegrated schools in the City School District;
 
 
 8
 The quality education programs for all schools in the City School District, but only insofar as these programs have been shown to be necessary for the city to retain its Class AAA rating or to be essential to the successful desegregation of the city schools as hereinafter set forth;
 
 
 9
 The provisions of the district court's order requiring the State of Missouri, as the primary constitutional violator, to pay the full cost of city to suburb and suburb to city transfers, magnet schools and integrative programs in the city schools, and one-half of the cost of the quality education programs in the city schools. We decline to approve the district court order insofar as it requires the State to fund student transfers between suburban school districts and to fund magnet schools or integrative programs in those suburban districts;
 
 
 10
 Improved facilities for the city schools. We require further planning, however, before construction begins, to identify with particularity the projects that will be undertaken, and to take account of a probable decline in the city school population in the next few years.
 
 
 11
 We outline the steps that the district court must take before it can require an increase in real estate taxes to fund the City Board's share of the quality education component of the plan without a vote of the people, and the steps that the court must take before it can require that bonds be issued to fund the City Board's share of capital improvements without a similar vote. We make it clear, however, that no party found to have violated the Constitution will be permitted to escape its obligation to provide equal educational opportunity to the black children of St. Louis.
 
 
 12
 We make it clear that the suburban schools meeting the goals set forth in the plan will receive a final judgment declaring that they have satisfied their desegregation obligations.
 
 
 13
 Finally, we recognize that the settlement agreement and the district court's order will have to be modified to conform to this opinion, and we are aware that the cost of the plan, particularly to the State, will be significantly reduced. In our view, however, the changes do not alter the essential character of the plan, and they preserve its constitutionality. The parties to the settlement agreement are required to decide promptly whether they will accept the changes set forth in this opinion. If they refuse to do so, the interdistrict trial will proceed.
 
 
 14
 I. PROCEDURAL HISTORY.
 
 
 15
 In February, 1972, a group of black parents (the Liddell plaintiffs) filed a class action against the City Board, the board members, and school administrators, alleging racial segregation in the city's schools in violation of the fourteenth amendment. The defendants' motion to join the State of Missouri and St. Louis County (containing the suburban school districts) as codefendants was denied on December 1, 1973. A year later, the parties entered into a consent agreement which provided for an increase in the number of minority teachers and included a pledge by the City Board to attempt to "relieve the residence-based racial imbalance in the City schools." Liddell v. Bd. of Educ., 469 F.Supp. 1304, 1310 (E.D.Mo.1979).
 
 
 16
 The case first came before this Court in 1976,[1] when the Caldwell plaintiffs appealed the district court's denial of their right to intervene. We granted intervention, but declined to pass on the constitutionality of the consent decree. Liddell v. Caldwell, 546 F.2d 768 (8th Cir.) (Liddell I ), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1976). We encouraged the United States and State of Missouri to intervene, recommended the creation of a biracial citizens committee to assist in formulating a desegregation plan, and suggested voluntary interdistrict student transfers as one remedial tool. Id. at 774.
 
 
 17
 Desegregation plans were developed and submitted to the district court by the City Board, the Liddell plaintiffs, the Caldwell plaintiffs, and the United States as amicus curiae. Before approving any plan, the district court ordered a trial to determine whether there had been a constitutional violation and to frame a remedy if a violation was found. The United States, the City of St. Louis, and two white citizens' groups were allowed to intervene as plaintiffs. The State of Missouri, the State Board of Education, and the Commissioner of Education were added as defendants. The district court found no constitutional violation, and held that the City Board had achieved a unitary school system in 1954-56 through its "neighborhood school policy." Liddell v. Bd. of Educ., supra, 469 F.Supp. at 1360-1361.
 
 
 18
 We reversed the district court in Adams v. United States, 620 F.2d 1277 (8th Cir.) (en banc ), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980),[2] holding that the City Board and the State were jointly responsible for maintaining a segregated school system. In reaching this decision, we noted that the Missouri State Constitution had mandated separate schools for "white and colored children" through 1976, that the State had not taken prompt and effective steps to desegregate the city schools after Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), and that the City Board's policies and practices since 1956 had contributed to the existing segregation. We remanded to the district court and directed that the schools be promptly desegregated. We suggested the following techniques:(1) Developing and implementing compensatory and remedial educational programs. * * *
 
 
 19
 (2) Developing and implementing programs providing less than full-time integrated learning experiences.
 
 
 20
 (3) Developing and implementing a comprehensive program of exchanging and transferring students with the suburban school districts of St. Louis County. * * *
 
 
 21
 (4) Maintaining existing magnet and specialty schools, and establishing such additional schools as needed to expand opportunities for an integrated education.
 
 
 22
 (5) Establishing an Educational Park.
 
 
 23
 (6) Continuing and expanding a policy of permissive transfers in the district.
 
 
 24
 Adams v. United States, supra, 620 F.2d at 1296-1297 (citations omitted).
 
 
 25
 After holding extensive evidentiary hearings, the district court approved a system-wide desegregation plan for the city schools beginning with the 1980-81 school year. Liddell v. Bd. of Educ., 491 F.Supp. 351 (E.D.Mo.1980). This plan included a comprehensive program of exchanging and transferring students between the city and suburban schools, the establishment of magnet schools and integrative programs, and a quality education component. In approving the plan, the district court concluded:
 
 
 26
 In sum, the State defendants stand before the Court as primary constitutional wrongdoers who have abdicated their affirmative remedial duty. Their efforts to pass the buck among themselves and to other state instrumentalities must be rejected[.]
 
 
 27
 Id. at 359.
 
 
 28
 We affirmed the district court's plan on appeal. Liddell v. Bd. of Educ., 667 F.2d 643 (8th Cir.1981) (Liddell III ), cert. denied, 454 U.S. 1081, 1091, 102 S.Ct. 634, 656, 70 L.Ed.2d 614, 629 (1982). In so doing, we decided that it was constitutionally permissible to allow a number of all-black schools to remain in the city. We noted that no all-white schools would remain, that a plan of voluntary interdistrict transfers would be initiated, that magnet schools and integrative programs would be established, and that a substantial part of the desegregation budget would be spent to improve the quality of education in the all-black schools. We affirmed the State's liability for desegregation costs and remanded for continued implementation of the plan.
 
 
 29
 Questions about this plan's implementation came before us in early 1982, when the State again protested its liability for certain desegregation costs. Liddell v. Bd. of Educ., 677 F.2d 626 (8th Cir.) (Liddell V ), cert. denied, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982).[3] We affirmed the district court's allocation of costs, placing one-half of the actual desegregation costs on the State. We also required the State to pay the costs of voluntary interdistrict transfers and the costs of merging city and county vocational educational programs. Meanwhile, the City Board and the Liddell and Caldwell plaintiffs continued to seek the consolidation of the city and county schools into a single integrated school district on the theory that the suburban schools had also violated the Constitution. They successfully moved to add the county school districts and St. Louis County officials as defendants to this litigation. We noted that the suburban schools could not be held as constitutional violators without further evidentiary hearings and findings by the district court. We again noted that the State and City Board--already adjudged violators of the Constitution--could be required to fund measures designed to eradicate the remaining vestiges of segregation in the city schools, including measures which involved the voluntary participation of the suburban schools. Liddell V, supra, 677 F.2d at 641.[4]
 
 
 30
 The district court entered an order on August 6, 1982, which disclosed the mandatory interdistrict plan it would impose in the event the suburban school districts were found liable for constitutional violations. This plan would create one unified metropolitan school district with a uniform tax rate. The court then scheduled interdistrict liability hearings.
 
 
 31
 Before these hearings were held, however, the City Board, the Liddell plaintiffs, the Caldwell plaintiffs, and all twenty-three county school districts developed a settlement agreement with the assistance of a court-appointed expert and filed a proposed consent decree on March 30, 1983. This agreement settled the plaintiffs' interdistrict claims against the county school districts, and also enabled the State and City Board to take important steps to desegregate the city schools through the voluntary participation of the county schools, as we outlined in Liddell V.
 
 
 32
 The settlement plan has several components. It provides for voluntary interdistrict transfers between city and suburban schools and includes fiscal incentives to encourage these transfers. Each county school district which receives enough transfers within five years to satisfy its desegregation obligations under the plan will receive a final judgment. Affirmative hiring requirements and voluntary teacher transfers are included in the plan to assure it will have a substantial impact in the county schools. To attract white student transfers to the city, and also to provide remedial programs for city students, the plan creates additional magnet schools in the city and the county, and has several compensatory and remedial education components. These latter components are designed to improve the quality of education in the city schools, and to make special improvements in the all-black schools.
 
 
 33
 After the parties filed the settlement agreement, the district court conducted hearings in April and May of 1983 to determine whether the settlement plan is fair, reasonable, and adequate. In its July 5, 1983, order, the court concluded the plan met these standards and allocated the costs of the plan between the State and City Board. Liddell v. Bd. of Educ., 567 F.Supp. 1037 (E.D.Mo.1983). The State is totally responsible for the costs of the voluntary interdistrict transfers, the magnet schools, and various part-time and alternative integrative programs. Further, the State will pay one-half of the cost of the quality improvements in the city schools and one-half of the capital improvements required by the plan. The City Board is required to pay the remaining costs.
 
 
 34
 The district court ordered the City Board to submit a bond issue to its voters before February 1, 1984, to fund its share of the capital improvements required under the plan. In the event this bond issue failed to obtain the necessary two-thirds vote the court reserved authority to consider an appropriate order to fund these capital improvements.[5] The district court also deferred a scheduled reduction in the City Board's operating levy otherwise required by Mo.Rev.Stat. Sec. 164.013 (Proposition C) insofar as this revenue is necessary to fund the City Board's share of desegregation costs. It further reserved authority to order an increase in the City Board's property tax rate, following notice and a hearing on the amount, if the revenue necessary to fund the City Board's constitutional obligation to desegregate the city schools is not otherwise available.
 
 
 35
 Several weeks after the district court entered its order approving the settlement, the State filed a motion to stay the implementation of the plan. The City of St. Louis filed a petition for a writ of prohibition seeking the same result. The district court denied both of these motions, and the State and City of St. Louis appealed to our Court. In an en banc order, Liddell v. Missouri, 717 F.2d 1180 (8th Cir.1983) (Liddell VI ), we denied the stay with certain exceptions. We froze the number of interdistrict transfers and deferred any further district court action concerning the City Board's property tax rate. We also deferred action on the writ of prohibition until we considered the case on its merits.
 
 
 36
 Appeals were filed from the district court's July 5, 1983, order by the State of Missouri, the City of St. Louis, the North St. Louis Parents and Citizens for Quality Education, and the St. Louis Teachers Union.
 
 
 37
 The State contends on appeal that the district court erred: (1) in approving additional interdistrict transfers of students, and requiring the State to pay the full cost of the additional transfers; (2) in approving additional magnet schools and part-time integrative programs, and requiring the State to pay their full cost; (3) in approving certain programs to improve the quality of education in the city schools, and requiring the State to pay one-half the cost of these programs; and (4) in ordering a deferral of scheduled property tax reduction for the city schools, and in stating that it would order a further increase in property taxes to fund the City Board's share of the cost of the quality education programs in the city schools.
 
 
 38
 The City of St. Louis joins in questioning the authority of the district court to enter the taxing order referred to in (4) above.
 
 
 39
 The St. Louis Teachers Union contends that the district court erred in denying its motion to intervene.
 
 
 40
 The Northside Parents Organization contends that the district court erred in failing to provide more extensive relief to the black students who would remain in the nonintegrated schools.
 
 
 41
 The United States did not file a notice of appeal or cross-appeal. It did file a brief and it was permitted to argue its position before the Court en banc. It appears to argue that many of the programs authorized by the district court may be necessary to desegregate the city schools, but questions whether the district court's factual findings are sufficient to support all aspects of the district court's remedial order. It asks this Court to remand to the district court to correct the alleged deficiencies.[6]
 
 
 42
 II. INTERDISTRICT TRANSFERS.
 
 
 43
 On July 2, 1981, the district court entered an order authorizing voluntary interdistrict transfers and requiring the State to pay the cost of the transfers. The program was initiated at the beginning of the 1981-82 school year, and by the end of the 1982-83 school year, it had grown so that 873 city students were attending county schools and 318 county students were attending city schools. All but seven of the 318 were enrolled in city magnet schools. The State of Missouri paid the cost of these transfers, including transportation costs and fiscal incentives, to the sending and receiving schools.
 
 
 44
 The settlement agreement calls for an expanded program of interdistrict transfers. City-to-county transfers of black students will be permitted to grow incrementally until they reach 15,000. No limit is placed on the county-to-city transfers, but the number is not expected to exceed 3,000. These transfers are expected to be primarily to city magnet schools and programs. Transfers between county districts are also permitted. All student transfers are voluntary.
 
 
 45
 The State's funding obligations remain as they were under the July 2, 1981, order: It must pay transportation costs and must pay to the receiving district for each transferring student an amount equal to the receiving district's cost per pupil, less State aid and trust fund allocation. It is further required to provide fiscal incentives to sending districts which may elect payment under one of two formulas: either one-half of the State aid the district would have received had the student not transferred; or, beginning in 1984-85, if a district sends more students than it receives, State aid based on the district's enrollment for the second prior year. To be eligible for transfer, students of good standing must be in the racial majority in their home districts and must transfer to districts where they would be in the racial minority.
 
 
 46
 After approval of the settlement agreement, transfers rose dramatically. During the current school year, 2,294 city students have transferred to suburban districts and three hundred and eighty-nine suburban students have transferred to city schools. Thirty-four suburban students have transferred to other suburban districts. One thousand nine-hundred and sixty-five additional city-to-county transfer applications are on file.
 
 
 47
 The settlement agreement provides that participating districts will receive a final judgment releasing them from further liability if they achieve the plan ratio[7] within five years. Litigation is stayed during this period. If the school district does not reach the plan ratio, litigation can be renewed after first pursuing various negotiating procedures. If the liability of any individual school district is litigated, the plaintiffs must prove liability and may not seek reorganization or consolidation of school districts, nor may they seek a minority enrollment exceeding twenty-five percent of the school district.
 
 
 48
 The State argues that the district court order approving the settlement agreement and requiring the State to pay the full cost of interdistrict transfers cannot be sustained because it imposes an interdistrict remedy based on an intradistrict violation. We disagree for two reasons: First, the issue has previously been decided adversely to the State; second, the interdistrict transfers are intrinsic to an effective remedy for the intradistrict violation and are justified by precedent.
 
 
 49
 A. THE PROPRIETY OF THE DISTRICT COURT'S ORDER WITH RESPECT TO INTERDISTRICT TRANSFERS HAS BEEN PREVIOUSLY DECIDED.
 
 
 50
 This Court has repeatedly authorized the interdistrict transfer of students as a fundamental element of an effective remedy for the unconstitutional segregation of the city schools. In Adams v. United States, supra, 620 F.2d at 1296, we specifically approved the development and implementation of "a comprehensive program of exchanging and transferring students with the suburban school districts of St. Louis County."In Liddell III, supra, 667 F.2d at 650, we rejected the State's argument that the district court was without authority to formulate an interdistrict plan without finding an interdistrict violation. We also noted that voluntary interdistrict pupil exchanges "must be viewed as a valid part of the attempt to fashion a workable remedy within the City." Id. at 651. In an order appended to that opinion, we noted that the State had been "judicially determined to be a primary constitutional violator," and we held that an interdistrict transfer plan would be salutary and would be entirely enforceable against the State. Id. at 659.
 
 
 51
 Finally, in Liddell V, supra, 677 F.2d at 630, we reiterated our conclusion that, because the State had been found a primary constitutional wrongdoer, it can "be required to take those actions which will further the desegregation of the city schools even if the actions required will occur outside the boundaries of the city school district." After discussing broad-based interdistrict proposals and dismissing them as unsuitable, we addressed the proper limits of the district court's equitable remedial authority:
 
 
 52
 [T]he district court can require the existing defendants--the state and city school board--to take the actions which will help eradicate the remaining vestiges of the government-imposed school segregation in the city schools, including actions which may involve the voluntary participation of the suburban schools. For example, the district court could * * * (4) require the state to provide additional incentives for voluntary interdistrict transfer.
 
 
 53
 Id. at 641-642 (footnote omitted).
 
 
 54
 We did not act hastily or arbitrarily in approving voluntary interdistrict transfers. We outlined the reasons for our decision in Adams v. United States, supra, 620 F.2d at 1291-1297. We reviewed the parties' proposed remedial alternatives, several of which involved extensive cross-busing between city schools. The Caldwell plaintiffs proposed a seventy-five percent black/twenty-five percent white racial mix within the district. The Liddell plaintiffs, through their expert witness, Dr. David Colton, proposed a four-tier division of the schools by age groups, which would integrate schools above fourth grade to achieve a sixty percent/forty percent or fifty-five percent/forty-five percent ratio of black to white students. All whites above third grade would attend integrated schools and all blacks would receive at least one-third of their education above third grade in integrated schools. The Department of Justice, through its expert witness, Dr. Gary Orfield, proposed maintenance and expansion of integration in all grades, voluntary interdistrict and intradistrict transfers, magnet schools, integration of personnel, and community involvement. The Board of Education proposed the creation of integrated junior high schools which would funnel students to high schools in a balanced fashion. Magnet schools would supplement these junior high schools. The white parents proposed that the schools be left as they were or, alternatively, that the city and county schools be merged and a comprehensive plan for interdistrict student transfers be developed.
 
 
 55
 Of the four plans submitted by the parties, we found that only the Colton and Orfield plans were constitutionally permissible. We rejected the City Board's plan as too little too late: elementary schools would remain entirely segregated and desegregation of the upper tiers would be delayed four to seven years. We rejected the Caldwell plan because the record supported the district court's finding that implementation of the plan would probably result in an all-black school system within a few years. We found that the Colton plan was permissible with some substantial changes, but that plan was discarded by the district court after it found that the plan was "educationally unsound" and that it would "fail to achieve effective desegregation." Liddell v. Bd. of Educ., supra, 491 F.Supp. at 356.
 
 
 56
 The approach suggested by the United States' expert, Dr. Orfield, was ultimately adopted by the district court as the plan that held "the promise of providing 'the greatest possible degree of actual desegregation, taking into account the practicalities of the situation.' " Id. at 359, citing Davis v. Bd. of School Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). We reaffirmed our support of the Orfield plan in Liddell III, supra, 667 F.2d at 649-653. We noted that it was the only constitutionally permissible plan submitted that could achieve stable, effective integration while minimizing transportation of students and maintaining integrated schools in integrated neighborhoods. Id. at 650.
 
 
 57
 The State defendants have raised the question of remedial scope twice before the Supreme Court. On June 17, 1981, the State filed a petition for certiorari from our panel opinion in Liddell III. In that petition, the State argued that there was no basis for State liability:
 
 
 58
 The evidence in this case indicates that the State of Missouri took the necessary and appropriate steps to remove the legal underpinnings of segregated schooling as well as affirmatively prohibiting such discrimination.
 
 
 59
 State's Petition for Certiorari, No. 80-2152, June 17, 1981, at 17.
 
 It further argued:
 
 60
 The District Court exceeded its authority in ordering the preparation of a plan of voluntary pupil exchanges between the St. Louis School District and nonparty school districts because (1) an interdistrict violation has neither been pleaded nor proven, and (2) the District Court cannot, consistent with Milliken v. Bradley, [418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069] order the State of Missouri to fund such a voluntary plan simply on the basis of an intradistrict violation.
 
 
 61
 Id. at 20.
 
 
 62
 The Supreme Court denied certiorari. Missouri v. Liddell, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 629 (1981).
 
 
 63
 Not satisfied with this answer, the State raised the same arguments again before our Court in Liddell IV and Liddell V. Unsuccessful in our Court, the State filed a second petition for certiorari with the Supreme Court on April 30, 1982. The State again argued that
 
 
 64
 ordering an inter-district remedy [the 12(a) voluntary transfers, funded by the State] without first finding an inter-district violation and inter-district effect is in conflict with this court's decision in Milliken v. Bradley I [418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069] [and Hills v. Gautreaux].
 
 
 65
 State's Petition for Certiorari, No. 81-2022, April 30, 1982, at 7; see also id. at 10.
 
 
 66
 Again, the Supreme Court denied certiorari. Missouri v. Liddell, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982). Both of the State's petitions for certiorari came after the Supreme Court's decision in Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).[8]
 
 
 67
 As a result of our previous holdings and of the Supreme Court's inaction, the use of interdistrict transfers is settled as law of the case. While this doctrine does not foreclose this Court from correcting its errors, it prevents repeated litigation of the same issue and promotes uniformity of decision. In Re Exterior Siding and Aluminum Coil Antitrust Litigation, 696 F.2d 613, 616 (8th Cir.1982), vacated en banc, 705 F.2d 980 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983). We will reconsider a previously decided issue only on a showing of clear error and manifest injustice. United States v. Unger, 700 F.2d 445, 450 n. 10 (8th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 339, 78 L.Ed.2d 308 (1983); Wrist-Rocket Mfg. v. Saunders Archery Co., 578 F.2d 727, 730-731 (8th Cir.1978).
 
 
 68
 We are loath to retract our previous declarations on settled issues when a case returns on appeal; to do so ignores important considerations of judicial economy and ignores our interest in protecting the settled expectations of parties who have conformed their conduct to our guidelines. In this case, our conclusion that State-funded interdistrict transfers are an appropriate remedy is strengthened by our previous invocation of the law of the case doctrine. Liddell V, supra, 677 F.2d at 629-630.
 
 
 69
 The State argues that we should not be bound by our earlier decisions because the magnitude of the proposed plan, with respect both to cost and numbers of students, distinguishes it from existing plans. Neither this Court nor the district court placed any limitation on the number of students that could transfer under the plan in existence during the last two school years, nor were we requested to do so. Moreover, it was clear that the number of transfers would have to be large if the opportunity for an integrated education was to be provided to a significant number of the 30,000 black students that remained in the all-black schools in the city.
 
 
 70
 Notwithstanding our view that the issues regarding interdistrict transfers have been heretofore decided, we again reach the merits of the matter and, alternatively, hold that the plan and the funding order, as they relate to interdistrict transfers, meet constitutional standards.
 
 
 71
 B. THE DISTRICT COURT'S ORDER WITH RESPECT TO INTERDISTRICT TRANSFERS MEETS CONSTITUTIONAL STANDARDS.
 
 
 72
 Since Brown v. Bd. of Educ., 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (Brown II ), principles of equity have guided courts in devising remedies to eradicate segregation and its effects. Yet for equitable remedies to pass constitutional muster, they must conform to three overlapping criteria.
 
 
 73
 [First], the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. * * * The remedy must therefore be related to "the condition alleged to offend the Constitution." * * * Second, the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." * * * Third, the federal courts * * * must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.
 
 
 74
 Milliken v. Bradley, 433 U.S. 267, 280-281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (Milliken II ) (citations and footnotes omitted).
 
 
 75
 Examination of voluntary interdistrict transfers confirms that, as a remedy for an intradistrict violation, such transfers comply with constitutional standards.
 
 
 76
 1. The remedy was closely tailored to the nature and scope
 
 
 77
 of the violation.
 
 
 78
 The Missouri Constitution requires the State to provide a free public education. Mo. Const. art. 9, Sec. 1(a). The State supervises instruction, distributes funds for public education to local school districts, approves school bus routes, provides free textbooks, and passes on applications by school districts for federal aid. See Mo.Rev.Stat. Secs. 161.092, 163.021, 163.031, 163.161, 170.051, 170.055; and Liddell v. Bd. of Educ., supra, 469 F.Supp. at 1313-1314.
 
 
 79
 Before the Civil War, Missouri prohibited the creation of schools to teach reading and writing to blacks. Act of February 16, 1847, Sec. 1, 1847 Mo.Laws 103. State-mandated segregation was first imposed in the 1865 Constitution, Article IX Sec. 2. It was reincorporated in the Missouri Constitution of 1945: Article IX specifically provided that separate schools were to be maintained for "white and colored children."[9] In 1952, the Missouri Supreme Court upheld the constitutionality of Article IX under the United States Constitution. See State ex rel. Hobby v. Disman, 250 S.W.2d 137, 141 (Mo.1952). Article IX was not repealed until 1976. Adams v. United States, supra, 620 F.2d at 1280. Under the segregated system, the State bused suburban black students from St. Louis County into the city's black schools to maintain the dual system. Id., at 1281. The city schools remained largely segregated until this Court's decision in Adams.
 
 
 80
 It is clear from the foregoing that the State's presence in public education is immense and that the State's Constitution and statutes mandated discrimination against black St. Louis students on the broadest possible basis. It is equally clear that the discriminatory policies continued after the Supreme Court decided Brown I, supra, in 1954. Given the breadth of the State's violation, it was appropriate for the district court to mandate an equally comprehensive remedy. The potential for integration within the district, however, was limited by the fact that almost eighty percent of the students were black, and by the district court's finding that if it integrated the city schools by imposing an eighty/twenty ratio in each school, an all-black school system would probably result. With that in mind, the district court properly considered the alternative of voluntary transfers to county districts. The opportunity for effective integration became a reality when the county schools agreed to accept the voluntary transfer of several thousand black students.[10]
 
 
 81
 2. The remedy restores the victims of discrimination as
 
 
 82
 nearly as possible to the position they would have
 
 
 83
 occupied absent that discrimination.
 
 
 84
 We have heretofore enumerated the alternative remedies suggested by the parties, and we have explained why the district court selected a remedy which included voluntary interdistrict transfers and why this Court approved that remedy. See supra pp. 1303 - 1304.)
 
 
 85
 We are met for the first time on this appeal with a new, or at least a more precisely framed, argument against interdistrict transfers. The State asserts that the district court cannot require the State to fund extensive interdistrict transfers unless the record supports and the district court finds that the black children of St. Louis would have attended schools in the county had it not been for the State's constitutional prohibition against black and white students attending schools together.[11] Nothing in the cases cited by the State[12] suggests or requires us to hold that the district court abused its discretion when it required the State to fund interdistrict transfers of students to consenting districts. Indeed Milliken II states that the remedy should correct conditions that "flow from such a violation" and should return victims "to the position they would have enjoyed in terms of education," but for the violation. Milliken II, supra, 433 U.S. at 282, 97 S.Ct. at 2758. This remedy does precisely that: It returns the largest number of victims to integrated schools and provides integrative opportunities and compensatory and remedial programs for those who cannot participate in the transfer plan. As the primary constitutional violator, the State is in no position to complain that some of the victims may elect to transfer to integrated schools in another school district that is willing to accept them.
 
 
 86
 In our view, Hills v. Gautreaux provides precedent for the remedy mandated by the district court. In that case, the Supreme Court considered a remedy against the United States Department of Housing and Urban Development (HUD) for discrimination in public housing in the City of Chicago. The United States Court of Appeals for the Seventh Circuit had reversed the district court's dismissal and ordered the district court on remand to enter summary judgment against HUD for violations of the Fifth Amendment and the Civil Rights Act of 1964 by knowingly sanctioning and assisting the Chicago Housing Authority's (CHA) racially discriminatory public housing program. Hills v. Gautreaux, supra, 425 U.S. at 291-292, 96 S.Ct. at 1543-1544. Thereafter, the plaintiffs requested that the district court require HUD to provide public housing outside Chicago's city limits. The district court refused, holding that the wrongs were committed solely against city residents and within the city's boundaries.
 
 
 87
 On appeal, the Court of Appeals for the Seventh Circuit reversed and the Supreme Court affirmed. The Supreme Court stated:
 
 
 88
 We reject the contention that, since HUD's constitutional and statutory violations were committed in Chicago, Milliken precludes an order against HUD that will affect its conduct in the greater metropolitan area. The critical distinction between HUD and the suburban school districts in Milliken is that HUD has been found to have violated the Constitution. That violation provided the necessary predicate for the entry of a remedial order against HUD and, indeed, imposed a duty on the District Court to grant appropriate relief. * * * Our prior decisions counsel that in the event of a constitutional violation "all reasonable methods be available to formulate an effective remedy," North Carolina State Board of Education v. Swann, 402 U.S. 43, 46 [91 S.Ct. 1284, 1286, 28 L.Ed.2d 586], and that every effort should be made by a federal court to employ those methods "to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation." Davis v. School Comm'rs of Mobile County, 402 U.S. 33, 37 [91 S.Ct. 1289, 1292, 28 L.Ed.2d 577]. As the Court observed in Swann v. Charlotte-Mecklenburg Board of Education: "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."
 
 
 89
 Hills v. Gautreaux, supra, 425 U.S. at 297, 96 S.Ct. at 1547 (emphasis added; citations omitted).
 
 
 90
 The Supreme Court then discussed Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ), and the limitation it imposed on the scope of the federal courts' equity powers. In Milliken I, the respondents alleged that the Detroit school system was racially segregated and they sought the creation of a unified school district as a remedy. Without finding constitutional violations by the suburban districts and without finding significant segregative effects in those districts, the district court ordered the consolidation of the Detroit school system with fifty-three independent suburban school districts. After the Court of Appeals for the Sixth Circuit affirmed this desegregation order, the Supreme Court reversed, holding that the order exceeded the district court's equitable powers: the courts must tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation." Id. at 744, 94 S.Ct. at 3127.
 
 
 91
 In evaluating the remedy in Hills according to Milliken I 's standards, the Supreme Court noted that nothing in Milliken I "suggests a per se rule that the federal courts lack authority to order parties found to have violated the Constitution to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred." Hills v. Gautreaux, supra, 425 U.S. at 298, 96 S.Ct. at 1546 (footnote omitted). In Hills, the Supreme Court approved the remedy because it did not coerce uninvolved governmental units and because CHA and HUD had the authority to operate outside Chicago's city limits. Id.
 
 
 92
 Justification for requiring the State to fund transfers between city and county schools is stronger than the justification for the remedy in Hills. Its role in education is much broader than HUD's role in housing. See supra p. 1305. In addition, the breadth, gravity and duration of the State's violation here was much greater. The violation scarred every student in St. Louis for over five generations and it gained legitimacy through the State Constitution and through the State's preeminent role in education. In following the Supreme Court's guidelines in Hills, we echo its conclusion concerning Milliken I. If we barred the use of interdistrict transfers solely because the State's constitutional violation took place within the city limits of St. Louis, we would transform
 
 
 93
 Milliken [I] 's principled limitation on the exercise of federal judicial authority into an arbitrary and mechanical shield for those found to have engaged in unconstitutional conduct.
 
 
 94
 Hills v. Gautreaux, supra, 425 U.S. at 300, 96 S.Ct. at 1547.
 
 
 95
 3. The district court's order with respect to interdistrict
 
 
 96
 transfers does not infringe on State or local
 
 
 97
 government autonomy.
 
 
 98
 The Supreme Court in Hills v. Gautreaux, supra, 425 U.S. at 298, 96 S.Ct. at 1546, has interpreted Milliken I to mean that district courts may not restructure or coerce local governments or their subdivisions. This remedy does not threaten the autonomy of local school districts; no district will be coerced or reorganized and all districts retain the rights and powers accorded them by state and federal laws. See Hills v. Gautreaux, supra, 425 U.S. at 305-306, 96 S.Ct. at 1550.
 
 
 99
 We also find unpersuasive the State's argument that funding this remedy will compel other budget cuts, which would interfere with the autonomy of state and local governments. If we accepted this argument, violators of the Constitution could avoid their remedial responsibility through manipulation of their budgets, leaving victims without redress. Simply put, parsimony is no barrier to a constitutional remedy; "it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." Watson v. Memphis, 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529 (1963).[13]
 
 
 100
 Interdistrict transfers between the city and the county schools may proceed pursuant to the settlement agreement, subject to the following exceptions:
 
 
 101
 (1) No additional transfers will be permitted for the balance of the current school year. Such transfers would disrupt the education of students in both sending and receiving schools. Planning and recruitment may continue so that enrollment may reach the levels contemplated in the settlement agreement.
 
 
 102
 (2) City-to-county transfers will be limited to a total of 6,000 students in the 1984-85 school year and to not more than 3,000 additional total transfers in each succeeding school year until the limit of 15,000 is reached. A shortfall of enrollment in one year may be made up in succeeding years.
 
 
 103
 (3) In the event the number of applicants for transfer exceeds the spaces available, priority shall be given to applicants who would otherwise attend an all-black school.
 
 
 104
 (4) In Liddell V, supra, 677 F.2d at 631-632, we warned of the need for vigilance to control the costs of desegregation. Budgetary constraints persist, and so does the need for frugality. We are unwilling, however, to accept the State's suggestion that "complementary zones" be established, which would effectively limit schools that transferees could attend. This would destroy the voluntary nature of the plan. Nevertheless, constant effort and careful planning must be made by all concerned to limit the costs of transportation, insofar as is consistent with the Constitution and the voluntary nature of the plan.
 
 
 105
 C. COUNTY TO COUNTY TRANSFERS.
 
 
 106
 Although we approve State funding of transfers of students between the city and county, we are unable to give similar approval to the funding of transfers of students between county districts. We emphasize again that the objective of transfers between the city and county is the eradication of segregation within the city. Such transfers are closely tailored to the violation and are clearly remedial with respect to that violation, according to the standards announced in Milliken II which were discussed above. Transfers between county districts, however, are not geared to remedy the violation found within the city. Nor does the record establish that intercounty transfers will materially assist in desegregating the city schools.
 
 
 107
 We recognize that some suburban school districts have majority black enrollments and others have nearly all-white enrollments. We acknowledge that the suburban districts would achieve a further degree of desegregation by such transfers. We neither prohibit nor discourage such voluntary transfers between county schools but we cannot compel the State to pay for them absent a finding of an interdistrict violation.
 
 
 108
 III. MAGNET SCHOOLS AND INTEGRATIVE PROGRAMS.
 
 
 109
 A. MAGNET SCHOOLS.
 
 
 110
 The district court and this Court previously authorized the creation of magnet schools and integrative programs. About 8,000 students (one-half of whom were blacks) participated in these schools and programs in the 1982-83 school year. Three hundred participants resided in the county. No one suggests that the magnet schools or integrative programs be discontinued.
 
 
 111
 The settlement agreement approved by the district court provides for the expansion or replication of existing magnet schools and programs and the development of new magnet schools and programs--in both the city and the county--with total enrollment to reach 20,000 students, twelve to fourteen thousand to be enrolled in city magnets and the balance in county magnets. The new schools would be phased in over the 1983-87 period.
 
 
 112
 To be eligible for transfer to the magnet schools, students in good standing must be in the racial majority in their home districts and must meet the qualifications for the magnets. Special eligibility requirements allow white students from the city to attend city magnets if the students now attend schools that are less than ten percent or over fifty percent white.[14] Black students in majority black districts are eligible to attend magnet schools and programs in other black majority districts if seats remain open after all of the host district's black students have been accommodated.
 
 
 113
 The State argues that insufficient attention has been devoted to developing a curriculum designed to attract county students. It also objects to being required to pay the full cost of building and operating the new magnets.
 
 
 114
 Before reviewing the State's specific arguments, we observe that the utility and propriety of magnets as a desegregation remedy is beyond dispute. In Adams v. United States, supra, 620 F.2d at 1296-1297, we evaluated the remedies we had previously found to be constitutionally permissible. We recommended "[m]aintaining existing magnet and specialty schools, and establishing such additional schools as needed to expand opportunities for an integrated education." Id. at 1297. We reiterated our approval of magnet schools in Liddell III, supra, 667 F.2d at 658 (emphasis omitted), where, in considering an intradistrict remedy, we directed the city and suburban school districts to undertake a "study of the feasibility of establishing magnet schools located in suburban districts with attendance open to students of both the suburbs and the city. * * * The location of these magnet schools should be determined by agreement between the St. Louis Board of Education and the suburban school districts involved." Finally, in Liddell V, supra, 677 F.2d at 642, we reaffirmed our conclusion that the district court could "require that additional magnet schools be established at state expense within the city or in suburban school districts with the consent of the suburban districts where the schools would be located." As with interdistrict transfers, our previous determinations in this case concerning magnet schools are law of the case.
 
 
 115
 Had we not in our previous decisions explicitly examined and approved the use of magnet schools and programs, the weight of precedent would nevertheless oblige us now to approve their use. In Milliken II, supra, 433 U.S. at 272, 97 S.Ct. at 2753, the Supreme Court mentioned magnet schools as a supplement to the compensatory and remedial programs which it approved in that case. Dissenting in another case, Justice Powell observed that the Supreme Court in Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 26-27, 91 S.Ct. at 1281, implicitly encouraged the use of magnet schools:
 
 
 116
 Incentives can be employed to encourage [majority-minority] transfers, such as creation of magnet schools providing special educational benefits and state subsidization of those schools that expand their minority enrollments. * * * These and like plans, if adopted voluntarily by States, also could help counter the effects of racial imbalances between school districts that are beyond the reach of judicial correction.
 
 
 117
 Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 488, 99 S.Ct. 2941, 2992, 61 L.Ed.2d 666 (1979).
 
 
 118
 This Court also approved magnets as a means of desegregating the Little Rock schools in Clark v. Bd. of Educ. of Little Rock, 705 F.2d 265, 269, 272 (8th Cir.1983).
 
 
 119
 Courts of Appeals in several other circuits have also approved desegregation plans which include magnets. Arthur v. Nyquist, 712 F.2d 809, 811-813 (2d Cir.1983); Berry v. School District of Benton Harbor, 698 F.2d 813, 819 (6th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983); United States v. Texas Education Agency, 679 F.2d 1104, 1110 (5th Cir.1982); Hart v. Community School Bd. of Educ., 512 F.2d 37, 54-55 (2d Cir.1975) (citing successful magnet programs in Boston, Massachusetts; Providence, Rhode Island; and Coney Island, New York); Stout v. Jefferson County Bd. of Educ., 483 F.2d 84, 85 (5th Cir.1973). District courts have also approved plans that include magnets. Tasby v. Wright, 520 F.Supp. 683, 741 (N.D.Tex.1981), aff'd in part, rev'd in part, on other grounds, 713 F.2d 90 (5th Cir.1983); Smiley v. Blevins, 514 F.Supp. 1248, 1260 (S.D.Tex.1981). A survey of the literature reveals that magnets are being used in at least eighteen cities. Rossell, Magnet Schools as a Desegregation Tool, 14 Urban Education 303, 320 (1979).
 
 
 120
 Despite the widespread approval of magnet schools by the federal courts, critics maintain that magnet schools cannot correct the deep-seated evils of school desegregation. See, e.g., Morgan v. Kerrigan, 530 F.2d 401, 410 & n. 10 (1st Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); Bradley v. Milliken, 484 F.2d 215, 243 (6th Cir.), rev'd on other grounds, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); Kelley v. Guinn, 456 F.2d 100, 108-109 (9th Cir.1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973). Yet the criticisms in these cases generally apply to desegregation plans in which magnets are the principal tool in a "freedom of choice" plan. They function differently in the settlement agreement approved here by the district court. Magnet schools are a single element of the panoply of remedies approved by this Court and the district court. Like the magnet schools in Stout v. Jefferson County Bd. of Educ., supra, 483 F.2d at 86, they are "part of a complex and many-faceted" plan. Magnets perform the salutary function of allowing "non-white as well as the white students so enrolled a chance to widen their horizons through the interplay of ideas and the absorption of diverse sub-cultural attitudes." Hart v. Community School Bd. of Educ., supra, 512 F.2d at 54.
 
 
 121
 Magnet schools under this plan will be distinguished by the features that have made them successful in other cities: individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment. See Rosenbaum and Presser, Voluntary Racial Integration in a Magnet School, 86 U.Chi.School Rev. 156, 156 (1978); Levine and Eubanks, Attracting Nonminority Students to Magnet Schools in Minority Neighborhoods, 19 Integrateducation 52, 57 (1981). Because they are supplemented by the extensive program of interdistrict transfers and compensatory education, these magnets will not resegregate, nor will they create a dualistic system with elitist schools.
 
 
 122
 We do not believe that the district court erred in ordering the State to pay the full capital and operating cost of magnet schools. As we noted earlier, the State's status as a violator of the Constitution compels the district court to remedy the deprivations the State has caused. In Liddell V, supra, 677 F.2d at 642, we held that the State could be ordered to undertake as a part of its remedial responsibility the development of magnets. Now we reaffirm that conclusion.
 
 
 123
 While we approve magnet schools and affirm the district court's decision concerning their funding, we see merit in the State's argument that careful study and planning must precede replication or expansion of magnets. New magnet schools must be approved by the Magnet Review Committee and the district court. The planning process should focus on those schools and programs that present a reasonable probability of attracting suburban white students; only those schools which demonstrate such a probability should be approved. The new schools should be phased in over a period of four years as provided for by the settlement agreement. The total number of students enrolled in city magnet schools shall not exceed 14,000.
 
 
 124
 We impose an additional limitation on the development of suburban magnets. Although a panel of this Court approved the use of suburban magnet schools in Liddell III, supra, 667 F.2d at 658-659; and Liddell V, supra, 677 F.2d at 641-642, the Court en banc does not believe that the record sufficiently supports this development. The county districts may proceed on their own, of course, without state funding. Any black city students who transfer into county-funded magnet schools would count toward achieving the district's plan goal and would contribute to the district's final judgment. State fiscal incentives would include payments to districts sending transferees to county-funded magnets, but the State will not be required to pay the capital or operating costs of county magnet schools as such.
 
 
 125
 B. PART-TIME INTEGRATIVE PROGRAMS.
 
 
 126
 Part-time integrative programs are primarily intended to provide integrative learning experiences for students attending all-black schools. Adams v. United States, supra, 620 F.2d at 1296; Liddell IV, supra, 693 F.2d at 727; Liddell V, supra, 677 F.2d at 642. These programs have been, and should continue to be, an important element of the overall plan to integrate the city schools. In determining the need for continuing the existing programs, or developing new ones, the City Board and the Budget Review Committee must keep the above standard in mind. They must also recognize that the number of black students in nonintegrated schools will decline dramatically over the next four years. We thus approve the district court's decision insofar as it permits the continuance of part-time integrative programs and requires the State to pay full cost of the approved programs.
 
 
 127
 We do not, however, specifically approve the new or expanded programs or the dollar amounts for these programs listed in the proposed budget (items A.4.10, A.4.11, A.5.01, A.5.02, A.5.04, A.5.05, A.6.01, A.6.03, and A.6.04). We rather require the City Board to resubmit to the Budget Review Committee, discussed infra Section VI, a list of the new or expanded programs that they would propose to implement. The total cost of these programs should not exceed $1 million. Further, these programs must not duplicate any programs approved in the quality education section of this opinion. Any dispute that emerges between the City Board and the State concerning these programs should be submitted for resolution by the Budget Review Committee and the district court in light of this discussion.
 
 
 128
 IV. QUALITY EDUCATION IMPROVEMENTS.
 
 
 129
 The settlement plan approved by the district court includes compensatory and remedial programs to improve the quality of education throughout the St. Louis public schools and additional programs for the same purpose in the nonintegrated schools. The district-wide improvements include a reduction in class size; restoration of art, music, physical education, and extracurricular programs; creation of pre-school centers and all-day kindergarten programs; additional staff to address the needs of handicapped students; additional nursing and counseling staff; and expansion of library and other media resources and services. Administrative improvements include curriculum and staff development, evaluation and performance assessment, and enhanced long-range planning.
 
 
 130
 The additional improvements for the nonintegrated schools include a further class-size reduction in grades K through 8, to twenty pupils per teacher; additional remedial instruction time through after-school, Saturday, and summer school programs; parental involvement programs; and alternative education options for black students unable to attend magnet schools. Other programs address motivational needs of students in the all-black schools by stimulating opportunities for student success and recognition, by introducing role models for academic achievement, and by establishing student concerns committees to address the morale, attendance, and behavior issues which emerge during the implementation of the plan.
 
 
 131
 A. LEGAL PRECEDENT FOR INCLUDING COMPENSATORY AND REMEDIAL PROGRAMS IN DESEGREGATION REMEDIES.
 
 
 132
 This Court suggested the necessity for remedial and compensatory programs in Adams v. United States, supra, 620 F.2d at 1296, and reiterated that need in Liddell V, supra, 677 F.2d at 641-642. We thus approve them in principle as law of the case. See supra p. 1304. Moreover, such programs have solid support in the case law as proper components of a desegregation remedy so long as they relate to the constitutional violation, are remedial in nature, and account for state and local autonomy. Milliken II, supra, 433 U.S. at 280-281, 97 S.Ct. at 2757.
 
 
 133
 In Brown I, the Supreme Court recognized that segregation harms black children by generating "a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." Brown I, supra, 347 U.S. at 494, 74 S.Ct. at 691. In light of this harm, federal courts have often required the inclusion of remedial programs in desegregation plans to overcome the inequalities inherent in dual school systems. Milliken II, supra, 433 U.S. at 283, 97 S.Ct. at 2758. See, e.g., Arthur v. Nyquist, supra, 712 F.2d at 811; Oliver v. Kalamazoo Bd. of Educ., 640 F.2d 782, 789-790 (6th Cir.1980); Evans v. Buchanan, 582 F.2d 750, 767-769 (3d Cir.1978) (en banc), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980); United States v. Texas, 447 F.2d 441, 448 (5th Cir.1971); United States v. Jefferson County Bd. of Educ., 380 F.2d 385, 394-395 (5th Cir.), cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967); Berry v. School Dist. of Benton Harbor, 515 F.Supp. 344, 369-373 (W.D.Mich.1981), aff'd and remanded, 698 F.2d 813 (6th Cir.1983); United States v. Bd. of School Comm'rs of Indianapolis, 506 F.Supp. 657, 671-673 (S.D.Ind.1979), vacated in part on other grounds, 637 F.2d 1101 (7th Cir.), cert. denied, 449 U.S. 838, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980).
 
 
 134
 Such programs "assist students who previously attended all-Negro schools when those students transfer to formerly all-white schools.... The remedial programs ... are an integral part of a program for compensatory education to be provided Negro students who have long been disadvantaged by the inequities and discrimination inherent in the dual school system." Milliken II, supra, 433 U.S. at 284, 97 S.Ct. at 2759 (emphasis in original), quoting Plaquemines Parish School Bd. v. United States, 415 F.2d 817, 831 (5th Cir.1969). Crucial to the Supreme Court's analysis in Milliken II is the concept that segregation not only inflicts harm on individual black students, but also builds "inadequacies [into the] * * * educational system." Milliken II, supra, 433 U.S. at 284, 97 S.Ct. at 2759 (emphasis added). Thus, to remedy the effects of a dual system which operated for decades with the sanction of law, remedial efforts must also concentrate on systemic educational improvements.
 
 
 135
 A secondary remedial objective of the quality education improvements is to enhance the appeal of the city school system, thereby promoting the chances of a stable and successful voluntary desegregation plan. The exodus of white parents and students out of fear of integration, or "white flight," is no excuse for school officials to avoid desegregating. United States v. Scotland Neck City Bd. of Educ., 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972); Monroe v. Bd. of Comm'rs, 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1968). Yet, "there is a valid distinction between using the defense of white flight as a smokescreen to avoid integration," and addressing "the probability of white flight in attempting to formulate a voluntary plan which would improve the racial balance in the schools without at the same time losing the support and acceptance of the public." Higgins v. Bd. of Educ., 508 F.2d 779, 794 (6th Cir.1974) (emphasis in original); accord Parent Ass'n of Andrew Jackson High School v. Ambach, 598 F.2d 705, 719 (2d Cir.1979). A child's enrollment in a particular school is the result of two decisions: the government's student assignment, and the parents' decision to stay, move, or send their children to private school. Thus, as Professor James Coleman insists, "government policies must, to be effective, anticipate parental decisions and obtain the parents' active cooperation." Coleman, New Incentives for Desegregation, 7 Human Rights 10, 13 (1978). Improving the quality of integrated schools consequently promotes parental acceptance of desegregation, and promotes the remedy's success. Gewirtz, Remedies and Resistance, 92 Yale L.J. 585, 652-653 (1983). See also Rossell & Hawley, Policy Alternatives for Minimizing White Flight, 4 Educational Evaluation and Policy Analysis 205 (1982).
 
 
 136
 The quality improvements for the all-black schools serve a further remedial objective. A strong presumption exists against the constitutional propriety of one-race schools, Swann v. Charlotte Mecklenburg Bd. of Educ., supra, 402 U.S. at 26, 91 S.Ct. at 1281, and any desegregation plan leaving one-race schools must be carefully scrutinized. Id.; Lee v. Macon County Bd. of Educ., 616 F.2d 805, 809 (5th Cir.1980). To overcome this presumption of unconstitutionality, a court must find that the existence of one-race schools is justified in light of the particular facts of the case and the feasibility of other desegregation techniques. Armstrong v. Bd. of School Directors, 616 F.2d 305, 321-322 (7th Cir.1980); Tasby v. Estes, 572 F.2d 1010, 1014-1015 (5th Cir.1978). When no other feasible desegregation techniques exist, then specific remedial programs for students in the remaining one-race schools may be included as a means of ensuring equal educational opportunity. See, e.g., Tasby v. Wright, supra, 713 F.2d at 95-97; Clark v. Bd. of Educ. of Little Rock, supra, 705 F.2d at 272.[15]
 
 
 137
 The district court held extensive hearings on the fairness of the quality education component, with lengthy testimony from local and State education officials, a number of expert witnesses, and representatives of the other parties. After reviewing the evidence and the recommendations of the court-appointed financial advisor, the court concluded that the programs fell within the proper remedial scope:
 
 
 138
 The sole purpose for the expenditure of funds under this Plan is to carry out the constitutional responsibility to remove the vestiges of a segregated school system. * * *
 
 
 139
 In no way should any funding provisions presently authorized by the Court be construed to authorize expenditures unrelated to City Board's desegregation obligations under the Constitution and the Settlement Plan as approved.
 
 
 140
 Liddell v. Bd. of Educ., supra, 567 F.Supp. at 1051-1052.
 
 
 141
 B. ANALYSIS OF THE COMPENSATORY AND REMEDIAL PROGRAMS APPROVED BY THE DISTRICT COURT.
 
 
 142
 The position of the State before this Court with respect to the quality education programs is somewhat ambiguous. In its opening brief, it argued that the city and county schools had not agreed to a quality education package and that therefore the district court had nothing to approve.[16] It further asserted that
 
 
 143
 [t]he Quality Education [component] is not only essential from a contractual point of view but also from a constitutional standing. The 15,000 black children in north St. Louis who will not have the opportunity to transfer under the Plan are still victims of constitutional wrongdoing as found by the court. The Quality Education section of the Plan is virtually the only remedy available to those black children to redress their wrong. Without it they stand as victims without redress.
 
 
 144
 State's Opening Brief at 26-27.
 
 
 145
 It concluded by stating that the court did not have the authority to modify the agreement to include the quality education component.
 
 
 146
 In its reply brief, the State changed the focus of its argument and complained that the provisions requiring improvement in the quality of education in the integrated schools were only remotely related to desegregation. It continued to assert this position at oral argument.
 
 
 147
 The State is not a party to the settlement agreement. It thus lacks standing to question the validity of the agreement on its terms. Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); Fisher v. Tucson School District No. 1, 625 F.2d 834, 837 (9th Cir.1980). Even assuming that the State has standing to raise such a question, the district court found that the parties had a meeting of the minds with respect to the essential terms of the agreement. This finding is not clearly erroneous.
 
 
 148
 The State clearly has standing, however, to challenge the district court's funding order and did so before that court. It renews that challenge here. It argues, in substance, that the court approved funding for general educational improvements in the integrated schools which were unrelated to desegregation.[17] Its argument here is twofold. First, the State contends that these programs may only be approved if the Court can find that they would have been a part of the city school system but for the past unconstitutional segregation. This position misreads the case law and ignores the reality of the harm imposed by segregated schools. The relevant inquiry is not whether, in absence of a de jure dual system, St. Louis schools would have had compensatory and remedial programs. None of the numerous cases cited above approving such programs rested on such a conclusion. The point is that compensatory and remedial education programs are necessary to remedy the effects of discrimination on the victims of segregation and the school system itself.
 
 
 149
 The second aspect of the State's argument is that there are no findings made by the district court, nor sufficient support in the record, to suggest that the quality education improvements are only remedial in nature.[18] The Second Circuit recently observed that the line between remedial purpose and general educational improvements unrelated to desegregation is inevitably blurred:
 
 
 150
 [A] court is entitled to require money for programs that materially aid the success of the overall desegregation effort. A program of that sort is not disqualified for needed funding simply because its inclusion improves the overall quality of the school system. At the same time a court must be alert not to permit a school board to use a court's broad power to remedy constitutional violations as a means of upgrading an educational system in ways only remotely related to desegregation. Striking the balance necessarily requires considerable deference by a district court to the good faith representations of the school authorities * * * and by a reviewing court to the knowledgeable assessment of a district judge intimately familiar with local conditions.
 
 
 151
 Arthur v. Nyquist, supra, 712 F.2d at 813 (citations omitted).
 
 
 152
 We think that the district court's order is fully supported as it relates to the quality improvements in the nonintegrated schools. Neither the State, the United States, nor the City specifically objects to these improvements. Moreover, they are consistent with the testimony of every expert witness that testified. The reduction in class-size was viewed by the witnesses for the black plaintiffs as critical to raising the achievement levels of black students. The programs designed to intensify remedial instruction, encourage parental involvement, and promote a positive learning climate reflect the objectives that the Supreme Court approved in Milliken II. See Bradley v. Milliken, 402 F.Supp. 1096, 1118-1119 (E.D.Mich.1975), aff'd and remanded, 540 F.2d 229 (6th Cir.1976), aff'd, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). The schools of emphasis assist in providing equal educational opportunity by providing alternative education options for black students unable to attend magnet schools. The motivational programs are designed to bring about productive attitudes towards learning, and are essential in the opinion of expert witnesses called by the black plaintiffs. See Haywood, Compensatory Education, 59 Peabody J. of Educ. 272, 274 (1982). Crain & Mahard, How Desegregation Orders May Improve Minority Academic Achievement, 16 Harv.C.R.-C.L.L.Rev. 693, 702 (1982).
 
 
 153
 Notwithstanding our affirmance in principle of the district court's order insofar as it relates to the all-black schools, we believe that the following modifications to the order should be made so that careful planning and effective implementation may proceed without disruption of the current school year:
 
 
 154
 (1) To the extent that any of the programs have been heretofore instituted, they may be continued. The remaining programs may be instituted at the beginning of the 1984-85 school year. The summer school program may be implemented for the summer of 1984.
 
 
 155
 (2) The reduction in class size from present levels to the 20:1 pupil-teacher ratio should be made over a period of four years beginning in 1984-85. The phased reduction recognizes that as many as 12,500 additional black students may transfer to county schools in the next four years, and that as many as 3,000 more black students may transfer to magnet schools during the same period. By coordinating the class-size reduction with the transfers, student and teacher disruption can be lessened and the construction or rehabilitation of school buildings to house the smaller classes minimized.
 
 
 156
 (3) The amount budgeted for item B.1.01, Coordination of Instruction, should be reduced by one-half. Evelyn F. Luckey, an expert witness for the Liddell plaintiffs, testified that the program could be successfully accomplished within the limits of the reduced amount.(4) The schools of emphasis should be phased in over a two-year period beginning in 1984-85.
 
 
 157
 (5) Detailed planning for the programs in the all-black schools should continue so that the programs can be implemented on schedule.
 
 
 158
 We cannot fully agree with the district court's conclusion that all of the quality education improvements in all schools are closely related to the integration process. While we concur with the Second Circuit's view that a district court should show considerable deference to the good faith representations of the school authorities, and that we should show similar deference to the judgment of the district court, a review of the record leaves us with the firm conviction that the district court erred in approving many of the programs in the quality education budget.
 
 
 159
 We begin our analysis by indicating our areas of agreement with the district court. Initially, we believe there is strong support in the record for approving those programs necessary to permit the city schools to regain, and then retain, their Class AAA status. This standard is developed by the Department of Education of the State of Missouri. See Handbook for Classification and Accreditation of Public School Districts in Missouri (1980). Seventy-four percent of the children attending Missouri public schools attend schools that have this rating. Missouri School Directory (1982-83). The City Board was denied this rating because its classes were too large, it had too many uncertified teachers, it lacked counselors in the elementary grades, it did not provide art, music, and physical education in the elementary grades, and its library and media services were inadequate.[19]
 
 
 160
 Second, we find adequate support in the record for preschool centers (budget item A.4.01, $811,000), and for planning and program development (a part of budget item A.1.01, $585,000). Both of these programs are recommended by the State Department of Education, and both have been shown to be closely related to the desegregation process.
 
 
 161
 Third, we find adequate support in the record for all-day kindergartens (budget item A.4.02, $6,129,000); parental involvement (budget item A.8.05); desegregation planning (budget item A.8.13, $41,000); long-range planning (budget item A.8.15, $431,000); and public affairs (budget item A.8.06, $184,000). The all-day kindergarten program serves several important compensatory and remedial objectives. Much of the testimony at the fairness hearings emphasized the importance of focusing desegregation efforts on the earlier grades, as younger children have developed fewer racial prejudices and differences in performance are narrower. See Hawley, Effective Educational Strategies for Desegregated Schools, 59 Peabody J. of Educ. 209, 214 (1982). The additional instruction time will also assist in building prerequisite skills for city pupils. The testimony also emphasized that many of the children came from single-parent families that did not provide them with the skills which would permit them to compete with other children at the first-grade level. See Milliken II, supra, 433 U.S. at 284, 97 S.Ct. at 2759. The all-day kindergarten program is an expensive one which must be implemented carefully if waste is to be avoided, and the full benefits of the program realized. We therefore direct that the program be phased in over a period of at least two years.
 
 
 162
 Parental involvement is similarly emphasized, both in the record and in the literature, as crucial to the success of the desegregation plan. See, e.g., Hawley, Effective Educational Strategies for Desegregated Schools, supra, at 212, 225-226. Because many students will not be attending their neighborhood schools as a result of the student transfers, special parent-staff seminars and other programs will be critical in developing and maintaining parental involvement. The changes involved in implementing the plan, and the future demographic and student enrollment shifts, render long-range planning essential to the successful desegregation of the city schools. The public affairs program is essential to citizen awareness and acceptance of the plan.
 
 
 163
 In light of the foregoing discussion, we approve the district court's funding order insofar as it relates to programs necessary to the city schools to retain their AAA rating. While the record is not entirely clear as to precisely what programs the State required the City Board to institute to regain this rating, it appears that they are budget items A.2.01, library and media services; A.2.02, audio visual services; A.3.01, lower class size; and A.3.02, restoration of art, music, and physical education. It is the intention of the Court that these budget items be implemented only insofar as necessary for the city schools to retain their AAA status. Retaining this status does not include a further class-size reduction in the integrated schools. We also approve the following additional programs: preschool centers, planning and program development, all-day kindergarten, parental involvement, desegregation planning, long-range planning, and public affairs.
 
 
 164
 We cannot, however, find adequate support in the record for the remaining programs. All are desirable, but the City Board has not made the case that they are necessary to provide equal educational opportunities to the children of St. Louis, or are otherwise essential as remedial or compensatory programs.
 
 
 165
 C. CAPITAL IMPROVEMENTS IN THE INTEGRATED AND NONINTEGRATED SCHOOLS.
 
 
 166
 The settlement agreement describes the age and condition of the city schools: Generally, they are in a condition of old age, rapid deterioration, and extreme deferred maintenance. Thirty-four of the nonintegrated black schools and twenty-one of the integrated schools are over fifty years old. Nearly one-fourth of the building area in the city schools is over seventy-five years old. Nearly one-half of the building area in the city schools is over sixty-five years old. More than two-thirds of the building area in the city schools is over fifty years old. At the fairness hearing, the district court heard uncontradicted evidence as to the condition of the city school facilities which paralleled that recited in the settlement agreement.
 
 
 167
 In the last twenty-four years, St. Louis voters have defeated thirteen proposed bond issues. The only bond issue to pass during this period was in 1962, and approval came only after resubmission to the voters. Significantly, both of the last two proposed bond issues were approved by a simple majority; the constitutional requirement of two-thirds voter approval, however, blocked passage of these issues.
 
 
 168
 At the fairness hearing, the State argued that more careful planning was required before renovation or new construction programs could be initiated, particularly in light of expected declining enrollment in the city schools. It also argued that the schools were in a deplorable condition because the City School Board had failed to maintain them over the years. It questioned whether certain items were properly included in the capital improvement budget, contending that they were routine maintenance items that should be funded exclusively by the City Board.
 
 
 169
 The district court's order and memorandum did not discuss the facility improvement program at length. It simply stated that
 
 
 170
 (b) the City Board shall submit to its voters, on or before February 1, 1984, a proposed bond issue of an amount determined by the City Board as sufficient to meet those of its capital improvement needs as are deemed necessary to meet its constitutional obligation to desegregate the City's public schools; [and]
 
 
 171
 (c) should that bond issue fail to obtain the two-thirds majority vote required by State law, the Court will consider an appropriate order to obtain the funds deemed sufficient to meet the capital improvement needs of City Board in complying with its constitutional obligation to desegregate the City's public schools.
 
 
 172
 Liddell v. Bd. of Educ., supra, 567 F.Supp. at 1056.
 
 
 173
 Pursuant to that order, the City Board formulated a building program with a total cost of $127 million, with one-half of the total to be financed by the issuance of $63.5 million in City Board bonds.
 
 
 174
 The bond issue was presented to the voters on November 8, 1983, and fifty-five percent of the voters approved the issue. Eighty-four percent of the voters in the predominately black wards voted for the issue, but sixty-five percent of the voters in the predominately white wards voted against it. The bond issue was defeated because it failed to receive a two-thirds majority.
 
 
 175
 On appeal to this Court, the State does not question either the need to improve facilities, nor its obligation to help pay for these improvements. In its opening brief, it argues that if the bond issue fails, the whole plan will fail for lack of funding because it is unfair to expect the State to pay the full costs of the improvements. It also renews its argument that, because the county schools failed to agree to a detailed building program, the settlement agreement as a whole must fail. Finally, it asserts that, in any event, the district court is without authority to enter an order requiring a tax levy to fund the City Board's share of the improvements. In its reply brief, the State simply states that the provision of the order requiring "extensive capital improvements" is "entirely out of proportion to the constitutional violations found by the District Court."
 
 
 176
 The district court did not err in holding that the State had an obligation to pay one-half of the costs of the capital improvement program necessary to restore the city facilities to a constitutionally acceptable level, and we find no merit in the State's suggestion that the district court's order cannot stand because the county districts failed to agree to the details of the facilities improvement program. See supra p. 1315.
 
 
 177
 There is merit to the State's argument that more careful and detailed planning should precede action by the district court and that this planning should identify the projects to be undertaken, establish the cost of each project and set a more specific schedule for the improvements. Planning and scheduling are particularly important in view of the expected decline in enrollment.
 
 
 178
 On remand, therefore, the City Board should promptly identify the projects to be undertaken, estimate the cost of each project, and set a reasonably detailed schedule for the completion of each project. The projects having the highest priority must be scheduled for completion at the earliest possible date. To that end, the City Board should consider the desirability of a referendum on a bond issue which can be initiated at a very early date and a subsequent bond issue for those projects to be built in later years. The State will pay one-half of the cost of preparing the detailed plans and schedules.
 
 
 179
 As soon as the City Board has prepared the new plans, estimates, and schedules, it shall submit them to the Budget Review Committee, discussed infra Section VI, and then to the district court. When the district court has approved them, a new bond issue shall be submitted to the voters. If it is defeated again, the district court shall determine how the improvements will be funded. See infra Section V.
 
 
 180
 V. FINANCING DESEGREGATION IN ST. LOUIS CITY SCHOOLS.
 
 
 181
 In November, 1982, Missouri voters approved a referendum (Proposition C) which directed local school officials to reduce their operating levies by an amount equal to fifty percent of the revenues local school districts would receive under a one-cent increase in the state sales tax. Mo.Rev.Stat. Sec. 164.013 (Supp.1983). In its July 5, 1983, order, the district court enjoined this rollback of local real estate taxes, Liddell v. Bd. of Educ., supra, 567 F.Supp. at 1056, and directed the Board of Education to use this money to fund the quality education programs necessary to restore the St. Louis schools to their AAA status. In our en banc order of September, 1983, we sustained the district court's injunction of the rollback on equitable grounds, for the injunction was already in place, and reversal at that time would have seriously disrupted St. Louis's system of school finance. Liddell VI, supra, 717 F.2d at 1182-1184. We sustain the injunction against the rollback for the balance of this school year for the same reason. The equitable nature of that decision obliges us now to examine the propriety and the merits of the district court's injunction of the rollback with respect to years beyond 1983-84. We also consider the district court's authority to order a further increase in property taxes to fund operating expenses or capital improvements.
 
 
 182
 We hold that the district court's broad equitable powers to remedy the evils of segregation include a narrowly defined power to order increases in local tax levies on real estate. Limitations on this power require that it be exercised only after exploration of every other fiscal alternative.
 
 
 183
 The district court's use of broad equitable powers concerning school desegregation costs has been approved by previous opinions of the Supreme Court. Thus, it has declared that, when predicated on a right and a violation, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Bd. of Educ., supra, 402 U.S. at 15, 91 S.Ct. at 1276. These powers subsume a broad range of ideas and tactics: equity assures that "all reasonable methods be available to formulate an effective remedy." North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). These powers may also be applied broadly "to achieve the greatest possible degree of [relief] taking into account the practicalities of the situation." Davis v. Bd. of School Comm'rs of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).
 
 
 184
 In Griffin v. School Bd. of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), the Supreme Court acknowledged that the district court may order an increase in taxes to fund schools where the State has defaulted on its obligation to provide an equal educational opportunity to all students. The Court did not limit the scope of its holding by ordering a return to the previous tax levy or procedures. It indicated only that the tax must be "necessary to prevent further racial discrimination" and that it must "raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system." Id. at 233, 84 S.Ct. at 1234.
 
 
 185
 In United States v. Missouri, 515 F.2d 1365 (8th Cir.), cert. denied, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975), this Court also acknowledged the district court's remedial power to require a tax levy in excess of that authorized by the voters. When the district court ordered the consolidation of three St. Louis suburban school districts with disparate tax rates ($3.80, $4.97 and $5.38), it concluded that a uniform tax rate higher than any of the three ($6.03) would be necessary "to effectively operate the desegregated district," id. at 1371, and that "[t]his rate, inclusive of the amount necessary to service the total debt of the enlarged district, shall be deemed to have been approved by the voters for the purposes of Article 10, section 11(c), Missouri Constitution." Id. at 1372. In setting that rate, the district court also noted that "there was no reasonable possibility that such a tax levy would be approved by the required two-thirds vote in the aftermath of the desegregation order." Id. at 1371-1372.
 
 
 186
 On appeal, this Court sitting en banc unanimously approved a rate of $5.38, the highest rate of the three districts. Judge Stephenson, writing for the full Court, stated:It is anomalous to suggest that the district court has the power to disestablish a dual school system but does not have the power to fashion an appropriate remedy. In North Carolina State Board of Education v. Swann, 402 U.S. 43, 45 [91 S.Ct. 1284, 1286, 28 L.Ed.2d 586] * * *, the court stated:
 
 
 187
 [I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees.
 
 
 188
 We have likewise held in ordering implementation of a school integration plan that "the remedial power of the federal courts under the Fourteenth Amendment is not limited by state law." Haney v. County Board of Education of Sevier County, supra, 429 F.2d at 368 [ (8th Cir.1970) ] * * *.
 
 
 189
 We are satisfied that the district court had the authority to implement its desegregation order by directing that provision be made for the levying of taxes essential to the operation of the new school district. It is our view, however, that deference should be given to the plan submitted in good faith by the state and county officials and which was largely accepted by the court. It was the view of the state that with the receipt of anticipated funds through action of the legislature the present Ferguson rate would be adequate. Maximum consideration should be given the views of the state and local officials concerned so long as they appear compatible with the goals to be achieved. The maximum rate in the new district should be reduced to $5.38 per hundred.
 
 
 190
 Id. at 1372-1373 (citations and footnote omitted).
 
 
 191
 The City cites Evans v. Buchanan, 582 F.2d 750 (3d Cir.1978) (en banc), for the proposition that the district court is without authority to order a tax increase to fund a court-imposed desegregation plan. The decision cannot be so construed. Indeed, the court en banc, relying on Griffin, made clear that the district court had that authority: had the State allocated "no funds, or substantially insufficient funds, to operate the remainder of the school system, such action by the State would clearly be unacceptable as interfering with the operations of the desegregation decree." Id. at 780. In addition, in Evans, the district court had acted before the "obvious inherent political safeguards * * * [were] permitted to run their course." Id. Our instructions on remand are entirely consistent with Evans because the district court must defer to the political funding process before it may consider ordering a tax increase. We read Evans for the proposition we stated at the outset of this discussion: a district court may require an increased tax levy, but only where necessary to remedy a violation of the Constitution, and only after exhausting all other alternatives.
 
 
 192
 The City and State also cite San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), in arguing that the courts should defer to the legislative expertise of state and local governments. That case is also distinguishable. It involved an equal protection challenge of Texas's use of the property tax for funding education. The appellants claimed that this system of taxes per se was discriminatory because it raised disparate revenues in different school districts according to disparities in the assessed valuation of property within the districts. The Supreme Court found no suspect class affected and no fundamental rights at stake. Instead, it relied on the "rational basis" test and deferred to legislative expertise in fiscal matters. On the other hand, in this case, the City Board and State have both been adjudged constitutional violators in matters involving a suspect classification. Moreover, in this case, no one challenges the mechanics of the tax system, which was the central issue in the passage from Rodriguez that the State cited.[20]
 
 
 193
 Our conviction that the district court's equitable power includes the remedial power to order tax increases or the issuance of bonds finds support in the case law surrounding the contracts clause of the United States Constitution. U.S. Const. art. 1, Sec. 10, cl. 1. The Supreme Court has recognized that a municipality's contractual obligations cannot be impaired solely because state law restricts its powers to tax in order to meet those obligations. When the City of New Orleans raised such an argument in an attempt to avoid its debts owed to the receiver of a metropolitan police board, the Court had no trouble holding that the courts could require "the city to pay over the taxes for which the judgment was rendered, or to levy and collect a tax therefor for the benefit of the relator as receiver." Louisiana ex rel. Hubert v. Mayor and Council of New Orleans, 215 U.S. 170, 181, 30 S.Ct. 40, 45, 54 L.Ed. 144 (1909). See also Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 103 S.Ct. 697, 705 n. 14, 74 L.Ed.2d 569 (1983) ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations."); United States Trust Co. v. New Jersey, 431 U.S. 1, 24, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977) ("[T]he taxing power may have to be exercised if debts are to be repaid. Notwithstanding these effects, the Court has regularly held that the States are bound by their debt contracts." [Footnote omitted.].
 
 
 194
 Similarly, courts have recognized that municipalities may not avoid their liability in tort by pleading constitutional or statutory debt limitations. Wichita Finance and Thrift Co. v. Lawton, 131 F.Supp. 788, 790 (W.D.Okla.1955); State ex rel. Martin v. Harris, 45 N.M. 335, 115 P.2d 80, 83 (1941); Raynor v. King County, 2 Wash.2d 199, 97 P.2d 696, 708 (1940); City of Catlettsburg v. Davis' Administration, 262 Ky. 726, 91 S.W.2d 56, 59-60 (1936); Town of Flagstaff v. Gomez, 29 Ariz. 481, 242 P. 1003, 1004 (1926); City of Long Beach v. Lisenby, 180 Cal. 52, 179 P. 198, 200 (1919) (taxes in such cases can be raised beyond their legal limits by the courts "without a vote of the people of said city.").
 
 
 195
 We turn to an evaluation of the district court's July 5, 1983, order in light of the foregoing discussion. We initially note that the district court declined to order an increase in real estate levies for operating purposes until the need for such revenues had been clearly demonstrated. It also declined to order a tax increase to fund capital improvements until such time as a bond issue of an amount determined by the City Board as sufficient to meet the most pressing capital improvement needs of the Board's constitutional obligation to desegregate had been submitted to the voters. It acted properly in both respects.
 
 
 196
 It went on, however, to authorize and direct the City Board to not reduce its operating levy as required by Mo.Rev.Stat. Sec. 164.013 (Proposition C), and to direct the State to refrain from withholding from the City Board funds that it would otherwise withhold pursuant to the same statute. It required that the revenue realized be utilized to fund the desegregation plan. It stated that any revenue thus retained but not necessary to fund the City Board's constitutional obligation should be applied to reduce its operating levy on July 1, 1984.
 
 
 197
 In our view, this order was deficient in that it was not accompanied by a factual finding by the district court that all other fiscal alternatives were unavailable or insufficient. We are unwilling to read such a finding into the record even though the record reveals that the City Board has little or no budget surplus, federal aid for desegregation has been cut, real estate values in the district have risen only slightly in recent years and referenda to secure additional funds have been largely unsuccessful.[21] On remand, the district court must allow the rollback under Proposition C to take effect for the 1984-85 school year unless it finds that no other alternatives are available or sufficient to finance its desegregation order. In addition, it shall not require any additional levy unless it makes similar findings.
 
 
 198
 Specifically, the district court should, first, promptly determine the amount of money that will be required in 1984-85 to fund the desegregation order and it should subsequently determine the funds necessary for each of the succeeding years. Second, the district court should determine whether the City Board is able, with its own resources, to fund its share of the costs. In making this determination, the district court shall consider the reduced budgetary pressures that will result from the transfer of nearly 6,000 students from city to county schools in 1984-85, and from the transfer of an additional 9,000 students in the following three years. In addition, the district court shall consider the effects of students transferring to magnet schools and of the City Board's receipt of transfer payments under the settlement agreement for sending students to county schools. Third, if the district court determines that the City Board lacks resources sufficient to fund its share of the desegregation order, it shall consider alternative sources of revenue. These alternatives include, but are not limited to: submission of a referendum to the voters for an increased operating levy; or authorization of the City Board by the State legislature to impose non-real estate taxes within the city. Fourth, if the voters refuse to approve a higher tax levy, or if the legislature fails to authorize the City Board to raise taxes from non-property tax sources, or if the City Board and the State, as joint tortfeasors, are unable to agree on an alternate method of raising the City Board's share of the cost, the district court shall conduct an evidentiary hearing and thereafter enter a judgment sufficient to cure the constitutional violations which we have found in a manner consistent with this and prior opinions.
 
 
 199
 VI. BUDGET REVIEW COMMITTEE.
 
 
 200
 The settlement agreement, the district court's funding order and opinion, and this Court's opinion have established detailed guidelines for desegregating the city schools over the next four years. The agreement provides for a number of committees to assist in desegregation. They include the Desegregation Monitoring and Advisory Committee, the Magnet Review Committee, and the Voluntary Interdistrict Coordinating Council. The function of the latter committee is to coordinate and administer the student transfers, the voluntary teacher exchanges and the part-time educational programs. A Recruitment and Counseling Center has also been established. Each of these committees and the Center fulfill important functions in the desegregation process and may be continued and funded in accordance with the settlement agreement at the discretion of the district court.
 
 
 201
 The district court also outlined the budgeting procedures that would be followed:
 
 
 202
 11. For the effective and timely implementation of the Settlement Plan, as approved, the following budgeting procedure shall apply with regard to all actual and reasonable costs, except transportation costs and costs incurred for the student transfer payments made to sending and receiving districts, incurred pursuant to the approved Plan:
 
 
 203
 (a) each participating school district shall deliver to State defendants a proposed budget for all desegregation programs and activities intended for implementation pursuant to the Settlement Plan[.] * * * For * * * fiscal [year 1984-85 and subsequent years], the budgets shall be delivered to the State on or before March 1 of the preceding fiscal year;
 
 
 204
 (b) the budget for the VICC and for the Recruitment and Counseling Center (RCC) shall be filed with the Court and submitted to the State on or before * * * March 1 of the preceding fiscal year;
 
 
 205
 (c) on or before [March 15 of each preceding fiscal year], representatives of the State and of each participating district shall identify in writing their areas of agreement and disagreement relating to budgetary matters. * * * After completion of these efforts, the representatives may submit to the Court a joint statement of budgetary matters then remaining in dispute for the Court's consideration.
 
 
 206
 [T]he State shall submit in writing any objections to the budgets for the VICC and for the RCC * * * on or before March 15 of the preceding fiscal year. After completion of these efforts, the representatives may submit to the Court a joint statement of budgetary matters then remaining in dispute for the Court's consideration;
 
 
 207
 (d) the Court's financial adviser may participate in the budget meetings between the State and the various representatives, and may present comments on the budgets to the Court either in writing directly, or at any subsequent hearing that may be required; and
 
 
 208
 (e) for the 1983-1984 fiscal year, any budget disagreements that remain, after the required meetings and reports, will be referred to United States Magistrate David D. Noce for a hearing on or before August 5, 1983. For subsequent fiscal years, the Court will consider any remaining disputed budget issues in a manner the Court deems appropriate.
 
 
 209
 Liddell v. Bd. of Educ., supra, 567 F.Supp. at 1057.
 
 
 210
 We believe that the budgeting process is deficient in three respects: (1) it fails to require long-range budgeting; (2) it does not give the State, the principal funding source for the plan, an adequate role in the budgetary process; and (3) it fails to provide an effective method of resolving budgetary disputes before they reach the district court. As a result, that court must spend an inordinate amount of its time resolving disputes that should be resolved by the parties.
 
 
 211
 We direct that a small budget committee be named, consisting of two representatives of the State of Missouri, one representative from the city schools to be selected by the City Board, one representative to be jointly selected by the Liddell and Caldwell plaintiffs, and a court-appointed expert in school financing at the earliest possible date. The court-appointed expert shall serve as chairman of the committee. Its responsibilities will be determined by the district court but will include:
 
 
 212
 (1) Preparing, with the cooperation from the participating school districts, a budget for the 1984-85 school year through the 1987-88 school year for each element of the desegregation plan (including capital requirements and updating that budget on an annual basis). These budgets should reflect the best current estimates that can be made of the probable cost of the plan for each of the next four years. The budgets will permit the State and the City Board to anticipate the funds that will be required to fund the plan. They will also force the participants to consider at an early date the dramatic changes that will occur in the city schools' student population in the integrated and nonintegrated schools and magnet schools, and will assist in the effort to control costs.
 
 
 213
 (2) Receiving the annual budgets prepared by the participating school districts on the same date that the budgets are to be received by the State. The State and each participating district will identify, in writing, their areas of agreement and disagreement relating to budgetary matters at a time to be determined by the court on the recommendation of the Budget Committee. The Budget Committee will make every effort to resolve differences as to the budget in accordance with the principles set forth in the settlement agreement, the district court's order and this opinion. Any unresolved disputes will be promptly presented to the district court with the recommendations of the court-appointed expert. The district court will resolve any disputes. This resolution is not an appropriate task for a United States Magistrate. The number of disputes should be dramatically reduced if the parties participate in good faith in the procedure outlined. The district court will enter an appropriate order with respect to the funding of the Budget Committee.
 
 
 214
 VII. OTHER ISSUES.
 
 
 215
 Several issues raised by various parties remain for resolution by this Court. We hold the following:
 
 
 216
 A. ST. LOUIS TEACHERS.
 
 
 217
 The district court did not err in denying the St. Louis Teachers Union Local 420 the right to intervene in these proceedings. The Union has, however, timely raised its interest in seeking preferential hiring rights for black city teachers in county school districts, and this interest is sufficient to allow its intervention in future proceedings. See Fed.R.Civ.P. 24.
 
 
 218
 We note further that the settlement plan contains annual hiring goals for black teachers and administrators in the county schools. Implementation of these goals requires only nominal monetary support from the State, and provides significant benefits to the county districts and the black plaintiffs. We approve this section of the settlement plan.
 
 
 219
 B. NORTH ST. LOUIS PARENTS.
 
 
 220
 The North St. Louis Parents and Citizens for Quality Education argue that the district court erred in approving the settlement plan because it sacrifices the interests of the black students who will remain in the all-black schools for the interests of the black students who will transfer to county schools. They base their argument on the fact that the amount of state funding for students who opt to bus to county schools greatly exceeds the amount of state funding to compensate students who remain in neighborhood all-black schools.
 
 
 221
 As we have discussed, supra p. 1314, equal educational opportunity for students remaining in one-race schools is a crucial concern in examining a desegregation remedy. The settlement plan contains significant quality improvements for the all-black schools, and we have approved these programs with minimal limitations. We find no evidence in the record to support the claim that the interests of students attending the all-black schools are being slighted. As we see the record, black students will now have several alternatives: attend their neighborhood school, attend an integrated school in the city or county, or attend a magnet school.
 
 
 222
 Both the North St. Louis Parents and the City argue that the district court failed to provide adequate notice to potential class members. We hold that the district court did not err in this regard. Nor did it deprive the North St. Louis Parents as class members of due process by failing to respond in detail to their objections to the settlement plan. The district court's opinion reveals that it engaged in a reasoned examination of objections raised by class members concerning whether the plan is fair, reasonable and adequate. Liddell v. Bd. of Educ., supra, 567 F.Supp. at 1042-1047.
 
 
 223
 C. THE CITY'S PETITION FOR A WRIT OF PROHIBITION, AND ITS OTHER REMAINING OBJECTIONS.
 
 
 224
 In our recent en banc order, we reserved a ruling on the City's petition for a writ of prohibition until we considered the merits on appeal. Liddell VI, supra, 717 F.2d at 1184. For the reasons discussed above, supra pp. 1323 - 1319, concerning the City Board's property tax rate, we deny the writ.
 
 
 225
 For reasons discussed throughout this opinion, we hold that the district court did not fail to evaluate the settlement agreement properly; we thus dismiss the City's objections on this point. The City argues further that the district court erred in denying or limiting cross-examination of experts at the fairness hearing. We find no abuse of discretion by the district court in this regard. See Fed.R.Evid. 611.
 
 
 226
 D. FINAL JUDGMENT FOR THE COUNTY SCHOOL DISTRICTS.
 
 
 227
 We specifically approve the settlement agreement insofar as it relieves the participating county school districts of liability if they meet the goals set forth in the settlement plan within five years.
 
 
 228
 We have considered all other arguments and find they have no merit.
 
 CONCLUSION
 
 229
 The judgment of the district court is affirmed in part and reversed in part, and this matter is remanded to the district court for action consistent with this opinion. The City Board, the City of St. Louis, the North St. Louis Parents and Citizens for Quality Education, and the St. Louis Teachers Union Local 420 will each bear their own costs on appeal. All other costs of appeal shall be taxed to the State of Missouri. The mandate of this Court will issue forthwith.
 
 
 230
 JOHN R. GIBSON, Circuit Judge, concurring in part and dissenting in part.
 
 
 231
 The Court today approves a settlement which in great part requires funding by the State of Missouri. The State of Missouri was not a party to this settlement. In the litigation before us the State has been found to be a constitutional violator insofar as there is an intradistrict constitutional violation within the City of St. Louis. The Court today improperly requires the State to fund a remedy far broader than this constitutional violation, an admittedly interdistrict remedy involving not only the schools in the City of St. Louis but the schools in St. Louis County. Accordingly, I must dissent in part.
 
 
 232
 It is necessary that we first determine what this Court has found to be the constitutional violations by the State of Missouri and then consider the nature of the remedy that may be employed in such circumstances.
 
 I.
 
 233
 Even though this case has been before this Court on four earlier occasions, the nature of the constitutional violation by the State of Missouri has been outlined only most generally. In our most recent opinion, Liddell v. Board of Education of City of St. Louis, 677 F.2d 626 (8th Cir.1982) (Liddell V ), cert. denied, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1983), the panel, speaking through Judge Heaney stated:
 
 
 234
 We held in Adams that the state had substantially contributed to the segregation of the public schools of the City of St. Louis. No appeal was taken from that decision by the state. That decision has been settled and will not be reopened.
 
 
 235
 677 F.2d at 629. The Court there referred to the 1981 decision, Liddell v. Board of Education of City of St. Louis, 667 F.2d 643 (8th Cir.) (Liddell III ), cert. denied, 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981), where the panel, again speaking through Judge Heaney stated:The State of Missouri vigorously contends that it should have no part in paying for the costs of integration because its actions did not violate the Constitution....
 
 
 236
 This contention is wholly without merit. In our March 3 opinion, we specifically recognized the causal relationship between the actions of the State of Missouri and the segregation existing in the St. Louis school system. Furthermore, we expressly directed the district court to apportion the costs of the desegregation plan among the defendants. Adams v. United States, supra, 620 F.2d at 1295 n. 28. These statements amount to a clear reversal of the district court's findings concerning the liability of the State, and the State has chosen not to seek review of that decision in the Supreme Court. At the very least, our opinion left the district court free to review its earlier conclusions. We will not disturb its decision to do so.
 
 
 237
 667 F.2d at 654.
 
 
 238
 These opinions referred to the earlier en banc decision in Adams v. United States, 620 F.2d 1277 (8th Cir.), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980). In Adams, the Court held that the district court had erroneously concluded that the Board of Education had discharged its duty to desegregate the St. Louis school system by adopting a neighborhood school plan and refraining from discriminatory actions thereafter and that factors over which the Board of Education had no control were responsible for today's segregation in the St. Louis school system. Adams, 620 F.2d at 1291. The Court observed that most schools in north St. Louis were black in 1954 and remained black and that most schools in south St. Louis were white in 1954 and remained white. The Board had not dealt with the problem in 1954 to 1956 by developing a plan that would integrate the schools in north and south St. Louis. The Court concluded: "We have no alternative but to require a system-wide remedy for what is clearly a system-wide violation." Id. Liddell III & V refer to the discussion on pages 1294 and 1295 in Adams, and footnotes 27 and 28. Testimony of Dr. Orfield that an interdistrict remedy funded by the State of Missouri would have the best chance of permanently integrating the schools in metropolitan St. Louis was discussed, together with the pre-Brown practices of both the St. Louis suburban school districts and those of the City of St. Louis to maintain segregated schools. The costs of the desegregation plan were to be apportioned among the defendants as determined by the district court.
 
 
 239
 It is evident that this discussion in Adams is dealing with the St. Louis City school system. The Board was directed to develop a system-wide plan for integrating the elementary and secondary schools. The Court remanded "to the district court with instructions to take those steps necessary to bring about an integrated school system" in accordance with certain guidelines and timetables set out. Adams, 620 F.2d at 1295. Cooperative transfers with suburban districts in St. Louis County were discussed.
 
 
 240
 This discussion in Adams does not address the question of interdistrict violation or interdistrict remedy.
 
 
 241
 This conclusion is fortified by the suggestion in Liddell V that "the interdistrict liability proceedings previously severed from the remainder of the case be postponed until after ... an order in the pending 12(c) proceeding" and that "the interdistrict liability aspect should then proceed promptly thereafter." 677 F.2d at 642. The district court and this Court have not to this time made findings or conclusions of interdistrict violation.
 
 
 242
 Liddell V made the following reference with respect to the State defendants:
 
 
 243
 [T]hey are primary constitutional wrongdoers and, therefore, can be required to take those actions which will further the desegregation of the city schools even if the actions required will occur outside the boundaries of the city school district.
 
 
 244
 677 F.2d at 630.
 
 
 245
 The decision discussed the voluntary participation of suburban schools and the preparation and submission of feasibility plans for interdistrict desegregation involving city and suburban schools. 677 F.2d at 641.
 
 
 246
 Following Liddell V, the district court commenced its preparation for trial of the interdistrict issues, but before the trial could proceed and findings on the interdistrict violation and remedy issues could be made, the settlement now before the Court was achieved, with the State not participating. From this history the only conclusion that we can reach is that the constitutional violation found on the part of the State and the City of St. Louis is failure to take necessary actions to desegregate the schools in the City of St. Louis and particularly to desegregate the schools on a system-wide basis, including the predominantly white schools in south St. Louis and the predominantly black schools in north St. Louis.
 
 II.
 
 247
 The scope of remedy available once a constitutional violation has been found has been discussed by the United States Supreme Court most recently in Pasadena City Board of Education v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), in which the Court speaking through Justice Rehnquist stated:
 
 
 248
 [I]n Swann the Court cautioned that "it must be recognized that there are limits" beyond which a court may not go in seeking to dismantle a dual school system. Id., [402 U.S.] at 28, [91 S.Ct. 1267 at 1282] 28 L.Ed.2d 554. These limits are in part tied to the necessity of establishing that school authorities have in some manner caused unconstitutional segregation, for "[a]bsent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis." Ibid.
 
 
 249
 427 U.S. at 434, 96 S.Ct. at 2704. The district court order in Pasadena was set aside, the Court finding that there was no showing that the post-1971 changes in the racial mix of the Pasadena schools was caused by segregative actions chargeable to the defendants, pointing to changes in the demographics of Pasadena's residential patterns. 427 U.S. 435-36, 96 S.Ct. at 2704-05.
 
 
 250
 The principles limiting available remedies were outlined in Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). The Court there reviewed the earlier decision in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ). It pointed to the fundamental limitation on the remedial powers of the federal courts to restructure the operation of local and state government, and explained that that power may be exercised only on the basis of constitutional violation. Hills, supra, 425 U.S. at 293, 96 S.Ct. at 1544, 47 L.Ed.2d at 801. The Court stated that
 
 
 251
 [o]nce a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation." In Milliken, there was no finding of unconstitutional action on the part of the suburban school officials and no demonstration that the violations committed in the operation of the Detroit school system had had any significant segregative effects in the suburbs. (Citations omitted.)
 
 
 252
 425 U.S. at 293-94, 96 S.Ct. at 1544-45.
 
 
 253
 Hills discussed the conclusions in Milliken I in detail as we have demonstrated above. Further limits established by Milliken I are as follows:
 
 
 254
 The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. Swann, 402 US, at 16, 28 LEd2d 554. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the raciallydiscriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.
 
 
 255
 418 U.S. at 744-45, 94 S.Ct. at 3127.
 
 
 256
 The Supreme Court more recently in General Building Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982), has held that judicial remedial powers of the federal court can "be exercised only on the basis of a violation of the law and ... [can] extend no farther than required by the nature and extent of ... [the] violation."
 
 
 257
 From this discussion it is apparent that the issue before this Court is what measures are tailored to fit the scope and nature of the State's constitutional violation. As we have seen, that constitutional violation is at most intradistrict in nature and, specifically, the failure to take measures to desegregate the St. Louis school system, particularly the north and south sides of that system. There is no hint of a finding that there was an interdistrict effect flowing from this intradistrict violation.
 
 
 258
 Under these principles the intradistrict violations found are insufficient to require the interdistrict remedy agreed to by all of the parties except the State of Missouri, and to impose the cost of this remedy on the State of Missouri. Because there are no findings by the district court as to the extent of the remedy required, this Court should not give its approval to a settlement placing substantial funding responsibility on the State of Missouri.
 
 
 259
 The Supreme Court in Hills concluded that selection of sites for public housing in the City of Chicago by HUD justified a remedy beyond the City of Chicago's territorial boundaries. The reasons for the conclusion were discussed as follows:
 
 
 260
 Here the wrong committed by HUD confined the respondents to segregated public housing. The relevant geographic area for purposes of the respondents' housing options is the Chicago housing market, not the Chicago city limits.... An order against HUD and CHA regulating their conduct in the greater metropolitan area will do no more than take into account HUD's expert determination of the area relevant to the respondents' housing opportunities and will thus be wholly commensurate with the "nature and extent of the constitutional violation." (citation omitted.)
 
 
 261
 425 U.S. at 299-300, 96 S.Ct. at 1547.
 
 
 262
 Hills does not justify the conclusion reached by this Court. In Hills HUD had made an expert determination that the Chicago area and not simply the City of Chicago was the relevant area. The wrongful act of HUD was confining the respondents to segregated public housing. We have no record in this case that the State of Missouri confined black students to the City of St. Louis as opposed to the county nor that the State had conceded the city and county to be the relevant area in issue. We have no finding that any of the intradistrict violations of the State which occurred within the City of St. Louis had any relationship to the county, or conversely that any acts of the State that may have been of an interdistrict nature affected the City. In Hills the particular facts pointed to the nature of the constitutional violation and a remedy in the larger area. Hills cannot support the interdistrict remedy approved by the Court today. The district court has made no findings in a vein similar to Hills and the Court in its opinion has reached no conclusions similar to those in Hills except the unsupported assertion that Hills justifies the remedy.III.
 
 
 263
 The Court today bases its approval of the interdistrict transfers on the questionable ground that this issue has been previously decided. The Court's earlier decisions, in which we have discussed the nature of the constitutional violation, do not support its conclusion.
 
 
 264
 Liddell III, supra, 667 F.2d 643, dealt with the earlier order of the district court relating to a voluntary cooperative plan of pupil exchanges between the city and county (12(a)), a merger and full desegregation of the separate vocational educational programs in the county and city (12(b)), and development and submission of "a suggested plan of interdistrict school desegregation necessary to eradicate the remaining vestiges of government-imposed school segregation in the City of St. Louis and St. Louis County." 667 F.2d at 650-51. The Court, with respect to paragraph 12(a), specifically states, "[b]ecause the plan is to be voluntary, no question is raised about whether the district court will be able to enforce the plan once it is drawn up." 667 F.2d at 651. Paragraph 12(b), relating to vocational education, was based upon a specific finding of the district court that a separate special district for vocational education was part of the State's failure to take affirmative steps to eradicate the dual system it had formally mandated, and was designed to remedy this violation.
 
 
 265
 Paragraph 12(c) in Liddell III relates to a suggested feasibility study and goes no farther. It recognized that to the extent that segregation was imposed by county school districts, not parties to the lawsuit and not designated as constitutional violators, it could not be considered as government-imposed. To the extent of any segregation imposed by the State or other defendants "and to the extent those defendants have the power to remedy the violation, it is proper for the district court to order them to take steps to do so." 667 F.2d at 651. The Court's opinion, however, cited no finding and made no conclusion that city-county interdistrict segregation was imposed by the State or the City Board. Later in the opinion, the Court specifically referred to the apportionment of costs in Adams. Liddell III, 667 F.2d at 654. In discussing apportionment of costs, the Court mentioned specifically the segregation existing "in the St. Louis school system." These statements but reinforce the Court's reliance on the intradistrict violation as the basis for its action. The Court today gives an overly broad reading of Liddell III.
 
 
 266
 In Liddell V, 677 F.2d 626, the Court recognized that Adams held that the State had contributed to the segregation "of the public schools of the City of St. Louis." Citing Hills, supra, it then concluded that paragraph 12(a) relating to voluntary interdistrict transfers is entirely enforceable against the State defendant and that the State can be required to take actions that will further the desegregation of the city schools, even if the actions required will occur outside the boundaries of the city school district. As we have seen, the Court in Liddell III & V did not attempt to identify a type of constitutional violation similar to that in Hills, in which actions had confined a certain group of persons to one portion of the area in question, or to demonstrate a finding, concession or conclusion that the city-county area should be considered as one. The Court was considering only "a modest beginning toward voluntary interdistrict desegregation." The Court concluded in Liddell V that the State and the city school board must take action to eradicate the remaining vestiges of government-imposed school segregation in the city schools. The Court's references to "actions which may involve the voluntary participation of the suburban schools" and, specifically, to "requir[ing] the state to provide additional incentives for voluntary interdistrict transfer," 677 F.2d at 641-42, were given by way of example only. The tentative suggestion that the State provide "additional incentives" is far from a conclusion that the State be required to fund a voluntary interdistrict transfer plan in which it was not a consenting party. These suggestions were made with reference to the 12(c) hearings which it suggested go forward, and which specifically related to development of a feasibility plan for overall integration. The interdistrict liability proceedings were to await this development. 677 F.2d at 642. The Court today has engaged in a massive bootstrapping effort to find that Liddell III or Liddell V has established the liability of the State for the interdistrict transfer plan.
 
 
 267
 The Court declares that we are bound by our previous holdings as to interdistrict transfers. The law of the case doctrine, however, applies with less force to prior decisions of a panel. Van Gemert v. Boeing Co., 590 F.2d 433, 436-37 n. 9 (2d Cir.1978); aff'd, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4478 at 796-97. Resting as it does on the precarious comparison with Hills, even if the issue were firmly established by Liddell V, the Court en banc should attempt to decide the case correctly rather than consistently. See Robbins, et al v. Prosser's Moving & Storage Co., 700 F.2d 433, 438 (8th Cir.1983); United States v. Unger, 700 F.2d 445, 450 n. 10 (8th Cir.1983); Wrist-Rocket Manufacturing Co. v. Saunders Archery Co., 578 F.2d 727, 730 (8th Cir.1978).
 
 IV.
 
 268
 The State was ordered to match funds raised in a bond issue submitted to the voters by the City Board for capital improvements. The issue failed and this Court's order rather hastily approves the summary treatment of the district court with respect to this issue.
 
 
 269
 The laws of Missouri place the responsibility for maintenance of the schools' physical plant on the City Board of Education. Mo.Rev.Stat. Sec. 177.031 (1984). This Court in its opinion correctly describes the age, deterioration and deferred maintenance of the plant. In twenty-four years thirteen bond issues have been defeated and one in 1962 approved only after resubmission. The last two bond issues were approved by a simple majority but the constitutional requirement of two-thirds voter approval has blocked passage of these issues.
 
 
 270
 There is no finding in the district court order and no conclusion by this Court that the condition of the physical plant of the St. Louis schools is related in any way to the constitutional violations of either the City Board or the State. There is nothing to suggest that the condition is other than purely and simply the result of the neglect of the City Board to fulfill its responsibilities. To order the State to pay half of this expense is to require a remedy beyond the constitutional wrong that has been found, which violates the principles laid down in Milliken I, Hills and Swann. This portion of the order violates the admonition of the Second Circuit in Arthur v. Nyquist, 712 F.2d 809, 813 (2d Cir.1983), that "a court must be alert not to permit ... use [of] a court's broad power to remedy constitutional violations as a means of upgrading an educational system in ways only remotely related to desegregation."
 
 
 271
 There are simply no district court findings and no conclusions by this Court to justify the State's participation in funding capital improvements. This is the sole responsibility of the City Board. Certainly in the absence of any findings by the district court that the segregative policies of the State had an impact on the city schools' physical plant, that funding of additional capital improvements is necessary to redress such wrong, and that less ambitious efforts would not have been adequate, there is simply no basis to mandate this aspect of state funding.
 
 V.
 
 272
 The Court today remands a portion of the funding order to the district court for further findings insofar as the district court issued specific mandates to the City Board with respect to its levy and the tax rollback. The Court, however, authorizes future specific action if the district court makes a finding that no other alternatives are available or sufficient to finance its desegregation order.
 
 
 273
 The Court need not and should not go this far. The taxing power of the states is primarily vested in their legislatures, deriving their authority from the people. Green v. Frazier, 253 U.S. 233, 239, 40 S.Ct. 499, 501, 64 L.Ed. 878 (1920). In Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), the Supreme Court ordered local authorities to operate a public school system like that operated in other counties in Virginia and to restore a tax illegally abolished, but specifically left the manner of levy and the amount and the means of collection to procedures under state law and standards. See also Plaquemines Parish School Board v. United States, 415 F.2d 817 (5th Cir.1969). Our earlier decision in United States v. Missouri, 515 F.2d 1365 (8th Cir.1975), cert. denied sub nom. Ferguson Reorganized School District v. United States, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975), simply permitted the tax levy to be established at the highest rate approved by voters in the largest district.
 
 
 274
 I have no quarrel with the proposition that, with proper findings that particular programs are necessary to remedy a constitutional violation that has been found to exist, a district court has the power to order the funding of those programs. The order should simply be in the form, however, to mandate that certain programs be carried out, and legislative bodies should be left with the responsibility for structuring the local or state taxing instrumentalities to achieve the result required. The federal courts go too far in mandating specific taxing procedures. I thus agree with the Court today only insofar as it mentions the option of the district court to simply enter a judgment against the State, as tortfeasor, for the amount required to fund those programs necessary to remedy the constitutional violation.
 
 VI.
 
 275
 The disagreement expressed with respect to the Court's opinion today is specifically limited to those areas set forth above. The programs required by the settlement plan within the city school district, and particularly within the all-black schools, to provide a quality education for those students deprived of proper educational opportunities by the segregative actions of defendants, and the enhancement and enrichment programs are fully justified by this Court's earlier findings of intradistrict violation. The magnet schools and integrative programs within the City of St. Louis are similarly geared to the particular violations that were found to have occurred. Thus, the opinion of the Court in III, IV (A) and (B) approved programs that are justified by the record before the district court, and this Court, and I join the Court in these portions of its opinion. The ruling on other issues in VII (A), (B) and (C) are properly reached.
 
 
 276
 The settlement plan is an inspired and far reaching one. I express my disagreement today only insofar as the State is required to fund a portion of this program that has been the subject of agreement by other parties and not the State, where there are no findings that those portions of the program are necessary to remedy the intradistrict constitutional violation that has been found. Even if the Court were to hold today in accordance with my views I believe that a settlement would nevertheless be achieved. The county school districts profit immeasurably by the settlement agreement, as nearly all of the funding obligation is placed upon the State and they are relieved of the risk of being found to have in any way contributed to any interdistrict segregation. The State has further incentive to reach settlement as to these issues, and properly should be allowed to have a voice in the extent of the programs to be funded, because such a great portion of the expenses must be borne by the State.
 
 
 277
 BOWMAN, Circuit Judge, dissenting.
 
 
 278
 I join in Judge John R. Gibson's well-reasoned dissent concerning the lack of findings to support the interdistrict aspects of the remedy, the lack of findings to support the requirement that the State provide funding for capital improvements in the physical plant of the City schools, and the singular inappropriateness in our Constitutional system of a federal court's ordering state and local taxing authorities to impose specific tax increases. His opinion adequately reflects my disagreement with the decision of the Court in all three of those areas. I cannot agree, however, that the remaining intradistrict aspects of the remedy approved by the Court are justified by adequate findings, and for that reason I dissent separately.
 
 
 279
 The issue in this case is not whether quality education is a good thing, or whether it would be wise public policy for the State to dedicate more of its resources to the public schools. Instead, the issue is whether, on the present record, we have the Constitutional authority to compel the State to provide funding for the array of costly programs required by the settlement plan. I submit that we do not.
 
 
 280
 The costs of carrying out the plan that the Court today approves will be enormous. For the 1984-85 year alone, the State's share of these costs is likely to exceed $49,000,000, with the City school board contributing additional funds of approximately $15,000,000. These costs, and particularly the State's share, will increase very substantially in future years as the pace of implementation quickens. If these costs are necessary to remedy a Constitutional violation, then they must be borne by the responsible parties--and ultimately by the citizens of the State--no matter how financially painful compliance may be. But if these costs go beyond what is needed to right a Constitutional wrong, if in fact the plan includes programs and amenities that may be laudable from an educational standpoint but are not tailored to the incremental segregative effects that have been caused by the Constitutional violation, then the effect of the Court's decision is to transfer, without any basis in law or the Constitution, funds from taxpayers or other competing programs (including other needy school districts) to the beneficiaries of this plan. Our problem as a reviewing court is that the record gives us no basis for an intelligent and principled determination of the critical question in this case: on which side of the line--Constitutional necessity or judicial excursion into policy-making and educational experimentation--do the various components of the plan approved by the district court fall?[1]
 
 
 281
 We do not have before us a desegregation plan fashioned by the district court after careful findings of fact of the kind required by the Supreme Court in Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 417, 420, 97 S.Ct. 2766, 2774, 2775, 53 L.Ed.2d 851 (1977). Rather, what we have before us is a desegregation plan fashioned by agreement of the City school board, the suburban school boards, and the plaintiffs. The State, which must bear the brunt of the costs, is not a party to the agreement. Over the objections of the State, the district court has adopted the agreement or plan, and it has done so without inquiring into the continuing effects of the Constitutional violation and the need for the various programs included in this plan to remedy those continuing effects.
 
 
 282
 In considering the proposed plan, the district court merely conducted a hearing to determine whether the proposed settlement plan "is fair, reasonable, and adequate for the resolution of the 12(c) interdistrict phase of this school desegregation case." Liddell v. Bd. of Educ., 567 F.Supp. 1037, 1039 (E.D.Mo.1983) (emphasis added). Thus the district court's inquiry was nothing more than the inquiry required under Rule 23(e), Fed.R.Civ.P., to determine whether a settlement of a class action should be approved. Moreover, the inquiry was focused on the interdistrict phase of the case, not the intradistrict phase. Finding the plan satisfactory in terms of the Rule 23 considerations set forth in Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), and in Professor Moore's discussion of Rule 23, 3B Moore's Federal Practice p 23.80 at 23-521 through 23-524, and giving a few obligatory bows to the Constitution in language wholly conclusory, the district court approved the plan and ordered all signatories, as well as the State defendants, to comply with all its provisions. 567 F.Supp. at 1042, 1055.
 
 
 283
 The district court's approach and its findings are totally inadequate to provide a Constitutional basis for its sweeping order and the only slightly less sweeping order that this Court today approves. The Constitutional violation that has been found against the City school board and the State[2] would justify requiring them to create a unitary school system within the City school district, but it does not justify the judicially-compelled creation of a system that never would have existed even if de jure segregation never had been practiced in the City schools. As the Supreme Court has made clear, the remedy in a school desegregation case should restore the students in the affected school district " 'to the position they would have occupied in the absence of such conduct.' " Milliken v. Bradley, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (citation omitted) (Milliken II ). Similarly, in Dayton, supra, the Supreme Court has made our duty--and the limits of our authority--plain. In that case the Court was dealing, as we are dealing here, with a situation where de jure segregation of the races in the schools ceased many years ago. If, said the Court, Constitutional violations are found, then
 
 
 284
 [T]he District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy.
 
 
 285
 We realize that this is a difficult task, and that it is much easier for a reviewing court to fault ambiguous phrases such as 'cumulative violation' than it is for the finder of fact to make the complex factual determinations in the first instance. Nonetheless, that is what the Constitution and our cases call for, and that is what must be done in this case.
 
 
 286
 Dayton, 433 U.S. at 420, 97 S.Ct. at 2775 (citation omitted).
 
 
 287
 In the case now before us, there has been no attempt to determine the incremental segregative effects of the Constitutional violation committed by the defendants or to compare the present City school population to what it would have been absent a violation. There has been no tailoring of the order to redress only "that difference" referred to in Dayton or to restore students in the City schools "to the position they would have occupied in the absence of such conduct" as required by Milliken II.
 
 
 288
 The district court's failure to conduct a Dayton -type inquiry and to make findings on incremental segregative effects has rendered it impossible for this Court properly to review the district court's order. This failure has left us without any measuring stick by which we can assess the various components of the settlement plan. The opinion of the Court implicitly recognizes this difficulty when, in searching for some standard to guide its review of certain of the compensatory and remedial programs approved by the district court, the Court resorts to a school classification device--Class AAA status--developed by the State's Department of Education as a means of rating schools, and approves programs necessary to permit the City schools to regain and retain their Class AAA status. Although the Court's need to find a standard to which it can repair is understandable, I do not believe that the approach taken is sound. There has been no showing of any kind that in the absence of the defendants' Constitutional violation the City schools would have maintained Class AAA status. Thousands of Missouri school children, over one-quarter of the total number, attend schools that lack Class AAA status. That fact alone, when coupled with the recent restoration of the City schools to Class AAA status, casts considerable doubt on the proposition that any educational problems that may exist within the City schools are of unusual severity or that they rise to a level of Constitutional concern. In any event, we cannot simply make assumptions about the continuing harms that have flowed from the violation; rather, these harms must be determined by the kind of fact-finding by the district court and review by this Court that Dayton mandates.
 
 
 289
 The process by which the settlement plan came into being underscores the need for careful fact-finding before imposing the plan and its burdensome costs upon the State. In the first place, it would be a most remarkable coincidence if a plan intended to settle the broad interdistrict claims in this case was at the same time properly tailored to cure only the effects of the intradistrict violation. Moreover, it must be remembered that the negotiations leading to the plan largely excluded the State, at least during the critical latter stages when it had become apparent to the State that it could not agree to a plan of the scope and cost that the other parties were determined to achieve. The plan was expressly conditioned upon compulsory funding from the State, and all the participating school districts stood to reap substantial benefits. None of them had any real incentive to prevent the others from piling their plates high with programs and funds that would benefit their school systems. As might be expected, there is no indication that the parties to the negotiations made any attempt to measure the incremental segregative effects of the violation on which the plan rests or to remedy only those effects. Such negotiations are inherently unlikely to produce a remedy narrowly tailored to the Constitutional wrong and any present-day educational deficiencies resulting therefrom that fairly may be charged to the State and, through it, to citizens in all walks of life throughout the State. Thus the need for judicial alertness, and careful fact-finding, is especially critical in this case.[3]
 
 
 290
 For the reasons stated above, I would reverse the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion. I would hope, of course, that the parties could resume their negotiations and achieve a settlement agreement to which all could assent.
 
 ORDER
 
 291
 On February 8, 1984, this Court filed its opinion in the St. Louis school desegregation cases. We directed that our mandate be issued forthwith. Thereafter, the State of Missouri notified the St. Louis County schools that it would discontinue payments for transporting students between county schools on February 17, 1984. It sent a similar notice to the parents of children participating in such transfers. Subsequently, the county schools and the Caldwell plaintiffs moved this Court for an order directing the State to continue to pay for transporting the county-to-county transfer students for the balance of the 1983-84 school year. At oral argument, it became clear that fiscal incentives for sending and receiving school districts were intended to be included within the purview of the parties' motions.
 
 
 292
 We consider the motions filed as motions to recall our mandate and to clarify or modify our opinion in the interests of justice. See Dilley v. Alexander, 627 F.2d 407, 410-411 (D.C.Cir.1980); Reserve Mining Co. v. Lord, 529 F.2d 181, 183 (8th Cir.1976); Reserve Life Ins. Co. v. Pitfield MacKay & Co., 528 F.2d 120, 123 (8th Cir.1976); Greater Boston Television Corp. v. FCC, 463 F.2d 268, 275-279 (D.C.Cir.1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972).
 
 
 293
 In our view, it would be inequitable to disrupt the education of the 311 students affected. It has been the consistent view of this Court in school desegregation cases that we will avoid disruption during the school year whenever possible. See, e.g., Liddell v. Missouri, 717 F.2d 1180, 1182-1183 (8th Cir.1983) (en banc) (Liddell VI ); Liddell v. Bd. of Educ., 667 F.2d 643, 654 (8th Cir.1981) (Liddell III ), cert. denied, 454 U.S. 1081, 1091, 102 S.Ct. 634, 656, 70 L.Ed.2d 614, 629 (1982). Cf. Lemon v. Kurtzman, 411 U.S. 192, 194, 199-200, 93 S.Ct. 1463, 1466, 1468-1469, 36 L.Ed.2d 151 (1973); Missouri ex rel. Freeman v. Block, 690 F.2d 139, 144-145 (8th Cir.1982) (equitable considerations important in remedial context).
 
 
 294
 We thus order the State to continue to fund county-to-county transfers for the balance of the current school year, including payments for transportation and fiscal incentives to sending and receiving school districts. At the end of the current school year, the State and the county school districts shall attempt in good faith to allocate the costs incurred by the State from February 21, 1984, to the end of the school year between the State and all county school districts that are signatories to the settlement agreement. If they fail, the district court shall, after an appropriate hearing, allocate the costs between the county school districts which signed the settlement agreement and the State in such proportions as it deems fair and equitable. If any party objects to this allocation, it may take an expedited appeal to this Court. We note that in determining the costs of transporting county students, only those costs that would not otherwise have been incurred by the State pursuant to this Court's opinion should be included.
 
 
 295
 We have before us a motion to dissolve a temporary stay issued by Judge Theodore McMillian for lack of jurisdiction. This issue has been mooted by the present order.
 
 
 296
 We also have before us a request by the Kirkwood school district for clarification of our opinion. In response to that request, we note that the State is obligated to pay fiscal incentives to a county school district which establishes a magnet school and receives black students from the City school district. Such State payments shall not, however, exceed the amount the county school district would receive if these transfer students were enrolled in the county's regular school. We direct that future requests for clarification of this Court's opinion should be taken initially to the district court.
 
 
 297
 The mandate previously issued is reconsidered and amended as indicated by this order. As amended, the mandate of this Court shall issue forthwith. To the extent not granted by this order, the petition for rehearing filed by the Parkway school district is denied.
 
 
 298
 HEANEY, ROSS, JOHN R. GIBSON and BOWMAN, Circuit Judges, concurring and dissenting.
 
 
 299
 We agree that the 311 county students who are now attending a district other than their own school should be permitted to complete the school year in the school they currently attend, and that the State should initially be required to cover these costs.
 
 
 300
 We also agree that at the end of the school year, the cost of permitting these students to finish the school year should be allocated by the district court. We would, however, require that court to allocate the cost among the county school districts that are signatories to the settlement agreement. We would not require the State to bear any costs of these transfers other than those incurred prior to February 21, 1984.
 
 
 
 [1]
 We recounted the procedural history of this litigation in Liddell v. Bd. of Educ., 677 F.2d 626, 628 n. 1 (8th Cir.1982) (Liddell V ), cert. denied, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1983) and Adams v. United States, 620 F.2d 1277, 1281-1283 (8th Cir.), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980)
 
 
 [2]
 We also ruled on several procedural questions in the interim between Liddell I and Adams, see Liddell v. Caldwell, 553 F.2d 557 (8th Cir.1977) (Liddell II )
 
 
 [3]
 We issued a procedural order in the interim. Liddell v. Bd. of Educ., 693 F.2d 721 (8th Cir.1981) (Liddell IV )
 
 
 [4]
 We suggested that
 the district court could (1) require the state and the city to take additional steps to improve the quality of the remaining all-black schools in the City of St. Louis; (2) require that additional magnet schools be established at state expense within the city or in suburban school districts with the consent of the suburban districts where the schools would be located; (3) require that additional part-time programs be established at state expense to provide for more integrative experiences for students in all-black city schools, including programs which would involve voluntary participation by suburban schools; and (4) require the state to provide additional incentives for voluntary interdistrict transfer.
 Liddell V, supra, 677 F.2d at 641-642 (footnote omitted).
 
 
 [5]
 The two-thirds majority is required by Mo. Const. art. VI, Sec. 26(b). This bond issue election was held on November 8, 1983, and it failed, receiving fifty-five percent voter approval
 
 
 [6]
 We question whether the United States should be heard as a party. Parties who do not appeal from a trial court judgment cannot be heard to attack that judgment, either to enlarge their own rights, or to lessen the rights of their adversary. See Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 190-191, 57 S.Ct. 325, 327-328, 81 L.Ed. 593 (1937); United States v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924); Stella v. DePaul Community Health Center, Inc., 642 F.2d 258, 261 (8th Cir.1981); Johnson v. United States Fire Ins. Co., 586 F.2d 1291, 1294 n. 7 (8th Cir.1978); Tiedeman v. Chicago, Milwaukee, St. Paul & Pac. R. Co., 513 F.2d 1267, 1271-1273 (8th Cir.1975)
 Here, the United States is requesting that the district court's order be vacated and that the case be remanded for further findings. This result would "lessen the rights" of the parties to the settlement agreement. In practical terms, however, we have considered the United States' position as an amicus curiae.
 
 
 [7]
 Under the Plan Ratio, * * * a suburban school district would accept up to as many black transfer students as would constitute 15 percent of the total student population in that district, but no suburban school district would be required to accept more black transfer students than would raise the overall percentage of blacks in the total student population higher than 25 percent
 Settlement Agreement, I-2.
 
 
 [8]
 Although denial of certiorari does not necessarily imply approval of the decision below on the merits, this Court has recognized that denial of certiorari is, under some circumstances, a fact which "cannot be overlooked." Wells v. Meyer's Bakery, 561 F.2d 1268, 1274-1275 (8th Cir.1977). See also United States v. Kras, 409 U.S. 434, 443, 93 S.Ct. 631, 636, 34 L.Ed.2d 626 (1973); United States v. Thompson, 685 F.2d 993, 999 (6th Cir.), cert. denied, 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982)
 
 
 [9]
 In addition, state law provided separate libraries, public parks, and playgrounds "for the use of white and colored persons," Mo.Rev.Stat. 10474 (1939), and established separate "institutes for colored teachers," Mo.Rev.Stat. 10632 (1939)
 
 
 [10]
 We also note that the remedial limits imposed by Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), are inapposite to this case. The findings of de jure segregation which distinguish this case were absent in Dayton. In that case, the Supreme Court considered the proper scope of an equitable remedy for three isolated instances of discrimination
 
 
 [11]
 The United States joins in this argument. In earlier proceedings before this Court and the United States Supreme Court, however, it supported the district court's remedial use of voluntary interdistrict transfers. It argued that voluntary interdistrict transfers properly remedied the State's violation, distinguishing them from the overbroad remedy in Milliken I, which involved "imposition of relief upon nonparty school districts." It asserted that the district court can "order those who have been found liable to make efforts to persuade those nonparty districts to cooperate voluntarily." U.S. Brief in Opposition to State's Petition for Certiorari, Missouri v. Liddell, No. 80-2152, Aug. 17, 1971, at 14 (emphasis in original)
 In a subsequent brief, the United States again distinguished the interdistrict transfers from the impermissible interdistrict remedy in Milliken I. Moreover, in endorsing interdistrict transfers, it stated that, under Hills, "the State parties can and should be required to take appropriate remedial action for the constitutional violations in which they participated." U.S. Brief in Opposition to the State's Petition for Certiorari, Missouri v. Liddell, No. 81-2022, April 30, 1982, at 7, 8.
 
 
 [12]
 Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (Dayton II ); Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); School District of Omaha v. United States, 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977); Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ); Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)
 
 
 [13]
 The district court's funding order poses no eleventh amendment problems. The State relies on Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974), to avoid its liability for a remedy that requires the expenditure of state funds where that remedy is allegedly overbroad. The Supreme Court in Milliken II applied the prospective compliance exception developed in Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." Milliken II, supra, 433 U.S. at 289, 97 S.Ct. at 2762. After elucidating the three criteria discussed earlier, the Supreme Court in Milliken II found that the plan under review there was constitutional. The interdistrict transfer plan under consideration in this case conforms to the same three criteria
 
 
 [14]
 Our affirmance in this case does not preclude the district court from reconsidering these special requirements--to the extent that they permit a white student attending a school with less than ten percent white enrollment to transfer to a city magnet school--in light of decisions by the Supreme Court and this Court. The district court may reconsider these requirements upon the request of any party
 
 
 [15]
 The quality of an all-black school is also improved when students attend such schools voluntarily. See Coleman, New Incentives for Desegregation, 7 Human Rights 10, 14-15 (1978). The settlement plan recognizes this imperative in providing for voluntary interdistrict transfers
 
 
 [16]
 Section IV of the settlement plan states:
 [T]he St. Louis County School districts do not have the necessary information about the city schools to form an opinion on the details of the Appendix and, therefore, they do not agree or disagree with all of the specifics in this basic design.
 
 
 [17]
 The State cites San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973), as support for the position that St. Louis students have no constitutional right to any particular level of education, but fails to note a critical distinction between Rodriguez and this case. Rodriguez held that property wealth is not a suspect class under the equal protection clause, and thus disparate educational expenditure levels between school districts were not a constitutional violation. Hence, the Rodriguez plaintiffs had no constitutional right to a particular level of education. Id
 Our case unquestionably involves a suspect class (race), and an established constitutional violation (a de jure dual school system). As noted above, courts have repeatedly endorsed compensatory and remedial efforts to overcome educational inadequacies imposed by segregated schools, Rodriguez notwithstanding.
 
 
 [18]
 To clarify, relating the remedy to the violation pursuant to Milliken II does not require a finding that each educational program at issue has in the past been "infected with the discriminatory bias of a segregated school system." Evans v. Buchanan, supra, 582 F.2d at 769, quoting Milliken II, supra, 433 U.S. at 275, 97 S.Ct. at 2754. It is sufficient to determine that the remedial program is directed to cure the general condition offending the Constitution
 
 
 [19]
 Since this Court's order of September 12, 1983, many of the changes necessary to gain a AAA rating have been implemented and the State has recently restored the AAA status to the city schools
 
 
 [20]
 The State relies on several older cases to argue that the district court may not order a tax levy to satisfy a judgment against a municipality. Each of these cases arose in a commercial context. In United States v. County Court of Clark County, 95 U.S. (5 Otto) 769, 24 L.Ed. 545 (1878), a bondholder sought a court-ordered tax levy to pay interest coupons for years preceding the year the bonds were issued. The Court declined to levy taxes because until the bonds were issued, the county had no obligation and no authority to levy the taxes. Rees v. City of Watertown, 86 U.S. (19 Wall.) 107, 22 L.Ed. 72 (1874), and United States v. County Court of Macon County, 99 U.S. 582, 25 L.Ed. 331 (1879), involved bondholders requesting court-ordered levies to pay for bond defaults. In both cases, the Court declined, holding the remedy barred by statutes in existence at the time the contracts of indebtedness were formed. Since the statutes became, by implication, a part of the contract, they precluded the use of the taxing remedy. Finally, in Citizens' Savings and Loan Ass'n v. Topeka, 87 U.S. (20 Wall.) 655, 22 L.Ed. 455 (1875), the Court declined to order a tax levy to pay for a default on bonds issued by a local corporation aided by the city. The Court reasoned that the tax would not have been lawful because it would not have been levied for a public purpose
 
 
 [21]
 Since 1970, five referenda have been submitted to the voters to increase the authorized operating levy. While one requested increase passed in 1976, the remainder failed even though three of these remaining four received a majority vote. We note, however, that an increase of $ .25 per $100 of assessed valuation in the current operating levy could be approved by a simple majority of the voters. Mo. Const. art. 10, Sec. 11(c)
 
 
 [1]
 A few examples will serve to illustrate the problem. The plan approved by the Court includes millions of dollars for such things as pre-school centers, all-day kindergartens, schools of emphasis (which are in addition to the magnet schools), parental involvement, and Saturday classes. The magnet school component, as presently structured, will require over $22,000,000 during the plan's first two years. During 1984-85 alone, the plan would provide $1,762,000 for an item designated "Coordination of Instruction"--whatever that may entail. It was not even mentioned, much less discussed or made the subject of fact-finding, during the hearing conducted by the district court, and the same is true of virtually all the plan's specific items. Substantial funding is provided for "Curriculum Development," "Peer Tutoring," "Shared Motivation," "Role model experiences," and "Strengthen the capabilities of the public affairs unit." The capital improvements section of the plan purports to "ensure a learning environment which complements and supports the instructional program in a manner which optimizes the learning process." While the professional educators who drafted the plan may be forgiven for writing that way, we should not be forgiven if we allow this plan to go into effect without first insisting that it be examined in the manner the Constitution requires. Because of the lack of appropriate inquiry and fact-finding below, there is now no jurisprudentially acceptable way for us to determine whether any of these items are needed to remedy the Constitutional violation
 
 
 [2]
 As Part I. of Judge John R. Gibson's separate opinion demonstrates, the exact nature of the Constitutional violation previously found in this case is not easily determined. I agree, however, with his conclusion that the violation found on the part of the City school board and the State is failure to take adequate steps to desegregate the schools throughout the City
 
 
 [3]
 The looseness, vagueness, and uncertainties of the plan were emphasized by one of the witnesses at the hearing before the district court:
 In nearly every program budget [of the plan], one can point to some strange budget items, some budget items which are not consistent with the description, certainly not with the planning as is in the case of many programs and I would not approve it under any circumstances until all those points were clarified, until it was clear what was expected to happen as a result of the expenditure of money, and only then if one could conclude it would not interfere so extensively with the programs in the City that they would be rendered in poorer shape than they are.
 Testimony of Otis Baker, Coordinator of State and Federal Programs, Division of Instruction, State Department of Elementary and Secondary Education. Tr. of Fairness Hearing, p. 169. Another witness, an out-of-state "expert" presented by the proponents of the plan, acknowledged during cross-examination that to her knowledge there is not another urban school system in the United States that has all the components that are included within the quality education improvements contained in the settlement plan. Testimony of Carol Gibson, Director of Education, National Urban League. Tr. of Fairness Hearing, p. 1-195. One of the opponents' witnesses made the following observation concerning the quality education improvements portion of the plan:
 This whole section of the proposal looks to be an attempt by the Saint Louis school board to justify every expense they now have and every kind of expenses they can dream up for the future, as a part of the desegregation case. We well remember their earlier attempt to have general maintenance and painting needs become a part of the start-up expenses for implementing the 12(a) plan now in effect.
 Testimony of Shannon K. Burnside, President, West County Association for Neighborhood Schools. Tr. of Fairness Hearing, p. 3-49, 50.